**In the Matter of Sam RAMOS, Debtor.**

**SEMMERLING FENCE & SUPPLY, INC. and Pioneer Fence & Pipe Supply, Plaintiffs,**

**v.**

**Sam RAMOS, d/b/a American Fence Co., a/k/a American Fence & Wire Co., Defendant.**

**PINE PIPE SUPPLY, INC., Plaintiff,**

**v.**

**Sam RAMOS, d/b/a American Fence Co., a/k/a American Fence & Wire Co., Defendant.**

**Bankruptcy Nos. 80–0104, 80–0105.**

United States Bankruptcy Court, W. D. Wisconsin.

Jan. 19, 1981.

Roy L. Prange, Jr. of Ross & Stevens, S. C., Madison, Wis., for Semmerling Fence & Supply, Inc. and Pioneer Fence & Pipe Supply.

Gerald C. Nichol of Lee, Johnson, Kilkelly & Nichol, S. C., Madison, Wis., for Pine Pipe Supply, Inc.

David E. Stewart, Madison, Wis., for Sam Ramos, defendant.

## OPINION AND ORDER

ROBERT D. MARTIN, Bankruptcy Judge.

The above-entitled adversary proceedings were consolidated for trial and tried to the Court on October 31, 1980. Plaintiffs objected to the discharge of the defendant (Ramos) specifying various grounds stated in 11 U.S.C. §§ 727(a)(2), (3), (4)(A), and (5).

Until he filed in bankruptcy on April 11, 1980, Ramos had since 1965 operated a fencing company as a sole proprietor. The fencing business is seasonal and involves virtually no work in December, January, February and March of each year. Although aware of his insolvency since December of 1978, Ramos operated the business through 1979. In late February, 1980, he closed all accounts of the business transferring remaining funds to his personal account. Accounts receivable of the business when it stopped active operation in December of 1979 were collected by Ramos and applied to personal expenses rather than the payment of business obligations.

During 1978 and 1979, Ramos was distressed by his business failure and drank heavily. During that period, he spent approximately $720 a month to go out drinking an average of five nights per week. Also during 1978 and 1979, he gambled regularly, both on card games and on the outcome of football games. Although Ramos testified that his gambling during that period was less than it had been previously, during the fall of 1979 he lost on football pools an indeterminate amount which he believed to be more than $1,000 and he hoped was less than $5,000.

During January, 1980, Ramos drew from his business by means of checks payable to his wife an amount of $1,500. In addition, during that month he took cash from the business in the amount of $520. In February, 1980, the last month in which business accounts were maintained, he drew $2,800 from the business by checks payable to his wife and drew an additional $3,000 in checks payable to cash. For each of these months, Ramos affirmed budgeted expenses of $1,100 and recreation expenses of $720. He offered no other explanation for the expenditures of the funds drawn from the business except that they went for "personal expenses" after February, 1980.

Sometime prior to 1978, Ramos became a one-quarter owner of a corporation known as American Fence Company of Stevens Point, Inc. Although not active in the operation of that business on a day-to-day basis, he did advise Mr. Tschudy, the majority owner and operator of the corporation, on the conduct of the fencing business. At some indeterminate date, not more than fourteen months prior to April 11, 1980, Ramos received a payment of $1,000 for his 25 percent interest in that corporation. He received no other income from American Fence Company of Stevens Point, Inc.

For several years, prior to filing bankruptcy, the books of Ramos' business were kept by Comprehensive Accounting Service. Ramos has no recollection of having provided or having authorized Comprehensive to provide any financial statements to Dunn & Bradstreet or to any individual creditor other than the Affiliated Bank of Hilldale for three or four years prior to April 11, 1980.

11 U.S.C. § 727 is based upon § 14 of the Bankruptcy Act and sets out the grounds for denying discharge in bankrupt-

cy. The plaintiffs rely on § 727(a)(2)(A), § 727(a)(3), § 727(a)(4)(A) and § 727(a)(5). Although the language of § 727 generally parallels the language of § 14, a specific comparison of the pertinent sections may aid the understanding of the precedents to this case.

Section 727(a)(2)(A) states:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition.

This section is based on § 14(c)(4) which states:

c. The court shall grant the discharge unless satisfied that the bankrupt has

. . . . .

(4) at any time subsequent to the first day of the twelve months immediately preceding the filing of the petition in bankruptcy, transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property, with intent to hinder, delay, or defraud his creditors.

The new language does not exactly track the Act's language. The organization has been changed and the word "mutilated" has been added to the list of wrongful acts. Otherwise, the one year time limit, the requirement of "intent to hinder," and the substance of what the debtor may not do, or may not permit others to do, appears unchanged.

Section 727(a)(3) states:

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

This section was derived from § 14(c)(2). The new section adds the words "any recorded information," "documents," and "papers." The remainder of the section is unchanged. The additions do not change the substantive law except to require the debtor to preserve more materials than "books of account or records" as required by § 14(c)(2).

Section 727(a)(4)(A) states:

(a) The court shall grant the debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account.

This section was derived from § 14(c)(1) and denies discharge if the bankrupt "committed an offense punishable by imprisonment as provided under title 18, United States Code, section 152." Title 18, U.S.C. § 152 provides in pertinent part: "[w]hoever knowingly and fraudulently makes a false oath or account in or in relation to any bankruptcy proceeding; . . . [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both." A prosecution for violation of 18 U.S.C. § 152, a bankruptcy crime, requires proof beyond a reasonable doubt. *United States v. Jessee*, 605 F.2d 430 (9th Cir. 1979). Denial of discharge is not a criminal proceeding. The burden of proof to deny discharge under § 14(c)(1) was a fair preponderance of the evidence as required by Bankruptcy Rule 407. *In Re Weiler*, 1 B.C.D. 1521 (S.D.N.Y. 1975). Bankruptcy Rule 407 remains in effect under the Code and governs the burden of proof to deny discharge under § 727(a)(4). Therefore, it appears that the law denying discharge due to a false oath remains the same under the Code as under the Act.

The last pertinent section is § 727(a)(5), which prevents discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this

paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." This language tracks § 14(c)(7), although the Code added the phrase "before determination of denial of discharge under this paragraph." Again, it appears that the substantive law in this area has not been changed.

■ To fully understand the limitations of prior case law, changes must be noted in the procedural requirements for the distribution of burdens of proof when objecting to discharge. Bankruptcy Rule 407 states:

BURDEN OF PROOF IN OBJECTING TO DISCHARGE. At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the facts essential to his objection.

The plaintiff has the initial burden of establishing a prima facie case. Then the burden shifts to the debtor to provide evidence to overcome the prima facie case. *In the Matter of Amador*, 596 F.2d 428, 5 B.C.D. 188 (C.A. 10th Cir. 1979); *In Re Lindsay*, 6 B.R. 705, 23 C.B.C. 420 (1980). Prior to Rule 407, the plaintiff had to show "reasonable grounds" for belief that the bankrupt committed the acts, then the burden would shift to the bankrupt to explain. *Federal Provision Co. v. Ershowsky*, 94 F.2d 574 (2nd Cir. 1938). Under present law, Rule 407, the plaintiff must go beyond a showing of "reasonable grounds" and must prove facts which will establish that the debtor has committed the act charged before the burden of going forward with the evidence will shift to the debtor. 4 Collier on Bankruptcy, 15th Ed., ¶ 727.03 (page 727–47).

■ The first aspect of the present case to be considered is the allegation that the defendant made false oaths. In order to deny discharge under § 727(a)(4)(A), the oath must have been knowingly and fraudulently made, *In Re Schnabel*, 61 F.Supp. 386 (D.C.Minn.1945) and must have related to a material fact. *Aronofsky v. Bostian*, 133 F.2d 290 (8th Cir. 1943).

■ As part of Ramos' voluntary chapter 7 petition, filed April 11, 1980, he filed a "Statement of Financial Affairs for Debtor Engaged in Business." That statement, at question 14(b), inquires:

14. *Transfers of Property.*

b. Have you made any other transfer, absolute or for the purpose of security, or any other disposition which was not in the ordinary course of business during the year immediately preceding the filing of the original petition herein? (Give a description of the property, the date of the transfer or disposition, to whom transferred or how disposed of, and state whether the transferee is a relative, partner, shareholder, officer, director or insider, the consideration, if any, received for the property, and the disposition of such consideration.)

Ramos' response was "No."

Question 18(a) inquires:

18. *Losses.*

a. Have you suffered any losses from fire, theft, or gambling during the year immediately preceding the filing of the original petition herein? (If so, give particulars, including dates, names, and places, and the amounts of money or value and general description of property lost.)

Ramos' response was "No."

Ramos signed the schedules next to the declaration, "I Sam Ramos certify under penalty of perjury that I (we) have read the foregoing schedules, consisting of 15 sheets, and that they are true and correct to the best of my (our) knowledge, information and belief."

In his "Statement of All Property of Debtor" (Schedule B–2) next to category "t. Stocks and interests in incorporated and unincorporated companies (itemize separately)," Ramos answered "None." These schedules were signed and certified in the manner described above.

At trial Ramos testified that he had owned a one-fourth interest in American Fence of Stevens Point and that he sold his interest to Herman Tschudy for $1,000, although he was unsure of when the sale took place. A certified copy of the Corporation Annual Report for American Fence of Ste-

vens Point, dated February 5, 1979, listed Sam Ramos, Herman Tschudy, and two others as officers and as directors of American Fence of Stevens Point and stated that there were four shareholders of the corporation. The 1980 Corporation Annual Report listed only Herman Tschudy as an officer or as a director of the corporation in 1980, and stated that the corporation had only one shareholder as of April 28, 1980. It is reasonable to conclude that Ramos' sale of his interest to Tschudy occurred between the filing of the two reports and therefore within fourteen months of the commencement of this bankruptcy case or within seventeen days thereafter. If the transfer took place during the twelve months prior to the filing of his petition, his answer to question 14(b) was false. If the transfer took place after the filing of the petition, his answer to question t (Schedule B–2) was false, A case very similar on its facts is *In Re Turner*, 185 F.Supp. 790 (M.D. N.C.1960). There the debtor failed to list in his schedules one share of stock purchased for $100 which gave him a one-third interest in a corporation. The court denied his discharge finding he had knowingly and fraudulently made a false oath. There is a question whether this debtor "knowingly and fraudulently" made this false oath. But, false statements in a debtor's schedules "must be regarded as serious business; reckless indifference to the truth . . . is the equivalent of fraud." *In Re Diorio*, 407 F.2d 1330 (C.A. 2nd Cir. 1969).

At trial Ramos also admitted gambling losses in excess of $1,000 and "hopefully" less than $5,000 during the year preceding the filing of the petition. That testimony contradicts his answer to question 18 in the "Statement of Financial Affairs of Debtor Engaged in Business" where he reported no gambling losses. Ramos' gambling involvement was on a regular basis and his losses were significant in size. However, knowing of his gambling losses, he failed to list his loss on question 18 of his statement of affairs. It is incredible that this debtor, who has been involved in circuit court actions because of his participation in gambling, had forgotten about his gambling

losses. I must conclude that Ramos intentionally answered question 18 falsely and knowingly and intentionally concealed gambling losses, perhaps as large as $5,000, on his schedules. "It is the law that fraud may consist of intentional suppression or concealment of the truth as to material facts." *In Re Schnabel*, 61 F.Supp. 386, 392 (Minn.1945).

▆ The last element to be determined is whether the false oath related to a material fact. Although an insignificant amount *might* be treated as immaterial, *Dilworth v. Boothe*, 69 F.2d 621 (5th Cir. 1934), the amount involved here is not insignificant. A loss "hopefully" less than $5,000 is a material amount. Materiality of the false oath does not require that the creditors were prejudiced by the false statement. *In Re Robinson*, 506 F.2d 1184 (2nd Cir. 1974). Materiality depends on whether the false oath was pertinent to the discovery of assets or past transactions. *In Re Mascolo*, 505 F.2d 274 (1st Cir. 1974). By his false oath in his schedules, Ramos attempted to conceal large gambling losses. Because it concealed debtor's past transactions and loss of assets, the false oath related to a material matter. Following the rule in *Schnabel, supra*, we must hold that Ramos has knowingly and fraudulently made a false oath as required by § 727(a)(4)(A).

A recent § 727(a)(4)(A) decision concerned schedules and a statement of affairs that contained numerous false statements. In denying the debtors' discharge, Bankruptcy Judge Lavien stated:

I find that the statements were made with a calculated disregard for the importance of documents which were signed under penalty of perjury and on which a determination on the request for a discharge would be made. This reckless disregard for the truth is the equivalent of the fraudulent intent necessary to bar a discharge. *In Re Mazzola*, 4 B.R. 179 (Mass.1980).

Ramos demonstrated a similar disregard for the importance of accuracy in preparing his "Statement of Affairs" and thereby demon-

strated that he too had the fraudulent intent required by § 727(a)(4)(A).

Having found one basis upon which the objection to discharge must be sustained, it is unnecessary to go further. However, a discussion of the remaining allegations is not inappropriate and may be instructive.

■ It was contended that the defendant failed to explain losses of assets. At trial, evidence was presented showing draws paid to Ramos, to cash, or his wife, from the business. In January these draws totalled $2,200 and in February, $5,800. Ramos was unable to explain what happened to these funds beyond stating that they were used for "personal expenses." He testified to monthly budgeted expenses of $1,100 and recreational expenses of $720, but could give no explanation to the significant difference between these expenses and the amount of cash withdrawn from the business in January and February of 1980. Section 727(a)(5) requires a debtor to explain satisfactorily any loss of assets or deficiency of assets to meet his or her liabilities. A satisfactory explanation of a loss of assets "must consist of more than vague, indefinite, and uncorroborated hodgepodge of financial transactions." *Baum v. Millikin*, 359 F.2d 811, 814 (7th Cir. 1966). A subpoena was served Ramos requiring him to bring to trial "all personal and family records" covering the period from January 1, 1978, to October 31, 1980. Ramos brought no records and offered no further explanation. He never provided more than a generalized, vague and uncorroborated explanation for this loss of assets. He, therefore, failed to provide a satisfactory explanation for the loss of the cash drawn from his business.

■ Transfers of defendant's property have also been questioned. The check records clearly show transfers from his business funds to his wife within one year of the filing of the petition. However, to bar discharge, the transfer must be with "intent to hinder, delay or defraud a creditor." The required intent must be actual intent rather than constructive, but the fact that valuable property has been gratuitously transferred raises a presumption that such transfer was accompanied by the fraudulent intent to bar discharge. *In Re Beckman*, 6 F.Supp. 957, 958 (W.D.N.Y.1934).

■ Ramos stated it was normal practice for his wife to write checks from the business to herself. These checks were clearly identified on the records, though the purpose for which they were drawn was not noted. Ramos stated that the funds were drawn from the business to pay for personal expenses. However, the amounts of the checks were well in excess of the expenses to which he testified.

The factual situation at bar is similar to that in *In Re Richter*, 57 F.2d 159 (2nd Cir. 1932) and *In Re Gurney*, 71 F.2d 144 (2nd Cir. 1934). In *Richter, supra*, $3,000 of the firm's money was given by the debtor to his wife within one year of the filing of his petition. $1,000 paid for a European trip for the debtor's mother-in-law, while the remainder was spent for the living expenses of the family. Because the wife had no claims against the debtor's firm, the court stated, "[t]here can be no doubt, therefore, that the finding of the referee that the $3,000 was turned over by David Richter without any pretense of a consideration for the transfer, was justified, and that it was essentially a transfer with intent to hinder, delay and defraud creditors." *In Re Richter*, at 160.

Similarly in *In Re Gurney, supra*, a debtor transferred $3,800 to his wife for "household expenses" shortly before filing his petition in bankruptcy. The debtor explained that his wife was a "better person" to have the money. The court denied debtor a discharge. Included in the court's finding was "the only apparent reason why his wife was a 'better person' to have the money than himself would seem to be the probability that his creditors would try to reach whatever assets he had." *Id* at 145.

The similarities between the case at bar and the *Richter* and *Gurney* cases are apparent. Relatively large transfers were made from business funds to debtors' wives for household-type expenses. The amounts

transferred were all in excess of current household expenses. None of the debtors stated the reason for the transfer to be to hinder, delay or defraud their creditors, but in both *Richter* and *Gurney*, the courts found such intent the only reasonable inference from the circumstances and explanations surrounding the transfers. The same inference, that Ramos had actual intent to hinder, delay or defraud his creditors by the transfers of business funds to his wife, may be drawn in the instant case.

 The sufficiency of the defendant's records has also been questioned by the plaintiff. Records are sufficient if they reflect with a fair degree of accuracy the debtor's financial condition. *In Re Simon*, 201 F. 1004 (D.C.N.Y.1939). Plaintiffs argue that the records' failure to show how the draws to Ramos and his wife were spent is a failure to keep or preserve recorded information requiring a denial of discharge under § 727(a)(3). Section 727(a)(3) requires records to allow creditors to ascertain business transactions. Ramos' records were regularly kept by a professional bookkeeping service and reflect business transactions based on cash flow, including payments to the defendant and his wife. How the draws described by defendant as used for personal expenses were disbursed should be among personal records. Section 727(a)(3) does not require the keeping of records that will allow creditors to ascertain personal transactions. As discussed previously, the failure to explain the use of personal funds which produces a loss of assets is a ground to object to discharge under § 727(a)(5). However, it does not by itself bar discharge under § 727(a)(3).

Upon the foregoing which constitutes my findings of fact and conclusions of law in this case, it is hereby

ORDERED that the discharge of the debts of Sam Ramos be and hereby is denied.