In re Daniel H. OVERMYER, Debtor.

The FIRST NATIONAL BANK OF BOSTON and D.H. Overmyer Telecasting Co., Inc., Chapter 11 Debtor-in-Possession, Plaintiffs-Movants,

v.

Daniel H. OVERMYER, Defendant-Respondent.

Bankruptcy No. 82 B 20329. 83 Adv. 6041.

United States Bankruptcy Court, S.D. New York.

June 19, 1985.

Motion to Amend Denied Oct. 25, 1985.

Reich and Reich, White Plains, N.Y., for Daniel H. Overmyer.

Parks, Eisele, Bates & Wilsman, Cleveland, Ohio, for D.H. Overmyer Telecasting Co., Inc.

Weil, Gotshal & Manges, New York City, for First Nat. Bank of Boston.

Harvey S. Barr, Spring Valley, N.Y., Trustee.

### DECISION ON COMPLAINT OBJECTING TO DISCHARGEABILITY OF DEBTS

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The First National Bank of Boston ("FNBB") and D.H. Overmyer Telecasting Co., Inc. ("Telecasting") have moved for partial summary judgment with respect to six counts of their amended complaint objecting to the dischargeability of the debts of the Chapter 7 debtor, Daniel H. Overmyer, to FNBB and Telecasting pursuant to 11 U.S.C. § 523(a)(4) and (6). The movants assert that there is no genuine issue of fact to be litigated because the debtor has fully litigated the underlying facts as an intervenor-plaintiff in the adversary proceeding reported as *Hadar Leasing International Co., Inc. v. D.H. Overmyer Telecasting Co., Inc. (In re D.H. Overmyer Telecasting Co., Inc.)*, 23 B.R. 823 (Bkrtcy. N.D.Ohio 1982), *aff'd*, 53 B.R. 963 (N.D. Ohio 1984) and as an officer, director and person in charge of The Overmyer Company, Inc. ("TOC") when it litigated the adversary proceeding reported as *First National Bank of Boston v. Overmyer Company, Inc. (In re Overmyer Company, Inc.)*, 2 B.C.D. 992 (Bkrtcy.S.D.N.Y.1976), *aff'd*, 697 F.2d 295 (2d Cir.1982). Accordingly, the movants contend that the debtor is collaterally estopped from contesting the findings of fact in the foregoing two bankruptcy cases.

The debtor maintains that collateral estoppel is not applicable because the Bankruptcy Courts in the two cited cases did not determine the issue of dischargeability and because the Ohio Bankruptcy Court's finding of fraud did not mention that the standard used was one of clear and convincing

proof rather than by a preponderance of the evidence. The debtor also argues that there was no determination that a fiduciary relationship existed prior to his misconduct or that there was a finding of defalcation, embezzlement, or willful and malicious injury as charged in the amended complaint in this case. Additionally, the debtor contends that his Ohio judgment liability to the movants in this case is based upon guarantees of loans and not because of any fraudulent conduct on his part, and that subsequent misconduct does not cause a preexisting liability to be nondischargeable.

## FACTS

1. On May 28, 1982, the debtor, Daniel H. Overmyer, filed with this court a petition for relief under Chapter 7 of the Bankruptcy Code.

2. FNBB filed a proof of claim in this case for $23,016,980.31 based upon the amounts awarded to it as a result of its counterclaims against the debtor in the *Hadar Leasing* case in the Bankruptcy Court for the Northern District of Ohio, reported at 23 B.R. 823, as affirmed by the District Court for the Northern District of Ohio on July 11, 1984.[1]

3. Telecasting is a Chapter 11 debtor in possession, operating under the aegis of the Ohio Bankruptcy Court since February 6, 1981. Its stock was pledged to FNBB by The Overmyer Company, Inc. ("TOC") to secure the indebtedness of TOC to the bank. FNBB is the record title holder of 249 shares of Telecasting stock as a result of a default in repayment. Telecasting filed with this court its proof of claim against the debtor in the sum of $3,557,-008.14, which resulted from the award to it on Telecasting's counterclaim against the debtor in the *Hadar Leasing* case in the Ohio Bankruptcy Court.

4. In count 18 of the complaint, FNBB alleges that its claim is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) due to the debtor's fraud or defalcation in connection with his fiduciary responsibilities to Telecasting.

5. In count 19 of the complaint, Telecasting also alleges that its claim is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) due to the debtor's fraud or defalcation in connection with his fiduciary responsibilities to Telecasting.

6. In count 20 of the complaint, FNBB alleges nondischargeability of its claim pursuant to 11 U.S.C. § 523(a)(4) due to the debtor's embezzlement or larceny.

7. In count 21 of the complaint, Telecasting alleges the same embezzlement or larceny as proscribed under 11 U.S.C. § 523(a)(4) for nondischargeability of its claim.

8. In count 22 of the complaint, FNBB seeks a denial of the dischargeability of its claim pursuant to 11 U.S.C. § 523(a)(6) by reason of the debtor's willful and malicious injury.

9. In count 23 of the complaint, Telecasting also seeks a denial of the dischargeability of its claim pursuant to 11 U.S.C. § 523(a)(6) because of the debtor's willful and malicious injury.

## DISCUSSION

Summary judgment under Fed.R.Civ.P. 56, as adopted by Bankruptcy Rule 7056, is an extraordinary remedy which should be granted with great caution and only where it appears that there is no genuine issue as to any material fact to be tried. *Katz v. Goodyear Tire and Rubber Co.*, 737 F.2d 238, 244 (2d Cir.1984); *Grand Union Co. v. Cord Meyer Development Corp.*, 735 F.2d 714, 717 (2d Cir.1984) (per curiam); *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). The court must resolve all ambiguities and draw all reasonable inferences against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8

---

1. Although not revealed in FNBB's proof of claim, the discrepancy of $473,205.04 between the amount of the claim, $23,016,980.31, and the judgment of $22,393,775.27 together with puni-

tive damages of $150,000 awarded by the Ohio Bankruptcy Court is presumably attributable to interest which accrued after the Ohio judgment was rendered.

L.Ed.2d 176 (1962) (per curiam). On a motion for summary judgment, the court may not try issues of fact and must only determine whether there are disputed issues to be tried. *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d at 1319–20. In the instant case, the movants rely upon the estoppel effect of the findings and determinations made by the Ohio Bankruptcy Court and the Bankruptcy Court in the Southern District of New York in *Hadar Leasing International Co. v. D.H. Overmyer Telecasting Co., Inc.* (*In re Overmyer Telecasting Co., Inc.*), 23 B.R. 823 (Bkrtcy.N.D.Ohio 1982), *aff'd*, 53 B.R. 963 (N.D.Ohio 1984), referred to as "the Ohio case" and *First National Bank of Boston v. Overmyer Company, Inc.* (*In re Overmyer Company, Inc.*), 2 B.C.D. 992 (Bkrtcy.S.D.N.Y.1976), *aff'd*, 697 F.2d 295 (2d Cir.1982), referred to as "the Southern District Case." Accordingly, partial summary judgment is warranted only if the findings in the foregoing bankruptcy cases satisfy the proof required to arrive at a determination of nondischargeability under 11 U.S.C. § 523(a)(4) or (6) in the context of the doctrine of collateral estoppel.

### COLLATERAL ESTOPPEL

As stated in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979):

Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.

*Id.* at 326, 99 S.Ct. at 649 (footnote and citation omitted). The doctrine of res judicata, or claim preclusion, is distinguishable from the principle of collateral estoppel in that res judicata forecloses all that which might have been litigated previously by the parties, whereas collateral estoppel treats as final only those issues actually and necessarily decided in a prior suit. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Parklane Hosiery Co. v. Shore*, 439 U.S. at 326 n. 5, 99 S.Ct. at 649 n. 5. In *Brown v. Felsen*, 442 U.S. 127, 139, 99 S.Ct. 2205, 2213, 60 L.Ed.2d 767 (1979), in dealing with the principle of res judicata, the Supreme Court noted in footnote 10 that if a state court determined factual issues in a state-law question, using standards identical to those of § 17 of the former Bankruptcy Act (now appearing as § 523 of the Bankruptcy Code), then collateral estoppel, in the absence of countervailing policy, would bar relitigation of those issues in the bankruptcy court. Mr. Justice Blackmun observed in this footnote that the case concerned res judicata only, and not the narrower principle of collateral estoppel. Moreover, the Supreme Court decided the preclusive effect of a state court judgment entered following a stipulated settlement where the issue of fraud had not been litigated. It has since been held that the doctrine of collateral estoppel may be applicable to a dischargeability determination in the bankruptcy court if the following conditions are met:

(1) the issue sought to be precluded must be the same as that involved in the prior action; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.

*In re Ross*, 602 F.2d 604, 608 (3d Cir.1979) (quoting *Haize v. Hanover Insurance Co.*, 536 F.2d 576, 579 (3d Cir.1976)). *See, e.g., In re Esposito*, 44 B.R. 817, 823 (Bkrtcy.S.D.N.Y.1984); *Revelle Motors, Inc. v. Spector* (*In re Spector*), 22 B.R. 226, 231 (Bkrtcy.N.D.N.Y.1982); *M & M Incorporated v. Supple* (*In re Supple*), 14 B.R. 898, 903 (Bkrtcy.D.Conn.1981); *Manning v. Iannelli* (*In re Iannelli*), 12 B.R. 561, 563 (Bkrtcy.S.D.N.Y.1981); *Tickner v. Allen* (*In re Allen*), 3 B.R. 355, 357–58 (Bkrtcy. W.D.N.Y.1980).

There is no question that certain of the issues concerning the debtor's fraudulent scheme and conduct, as involved in the

prior actions in the Ohio case and the New York Southern District case, are the same issues that the movants rely on in the instant case. Moreover, these issues were actually and fully litigated by the parties and determined by valid and final judgments. Such determinations were essential to the prior judgments. Nevertheless, the dischargeability of the debtor's obligations incurred as a result of the judgments in the Bankruptcy Courts in Ohio and the Southern District of New York was not in question. This point gives rise to the debtor's contention that the standard of proof applied in the prior cases was different than that required in dischargeability cases. The debtor asserts that the Bankruptcy Court in Ohio made its findings on the basis of the preponderance of the evidence standard, whereas nondischargeable conduct under 11 U.S.C. § 523 requires proof that must be established by clear and convincing evidence. *Seepes v. Schwartz (In re Schwartz)*, 45 B.R. 354, 357 (Bkrtcy.S.D. N.Y.1985); *Lincoln First Bank, N.A. v. Vairo (In re Vairo)*, 40 B.R. 776, 779 (Bkrtcy.S.D.N.Y.1984); *In re Cerrato*, 31 B.R. 444, 448 (Bkrtcy.S.D.N.Y.1983); *In re Buford*, 25 B.R. 477, 481 (Bkrtcy.S.D.N.Y. 1982); *Household Finance Corp. v. Callery (In re Callery)*, 6 B.R. 527, 529 (Bkrtcy.S.D.N.Y.1980).

■ The requirement in *Brown v. Felsen* that the standard of proof be identical for determining the preclusive effect of a prior state lawsuit upon a bankruptcy case in the context of res judicata, or claim preclusion, is predicated on the principle that the bankruptcy courts have exclusive jurisdiction in dischargeability cases. *See* Ferriell, *The Preclusive Effect of State Court Decisions in Bankruptcy*, 59 Am. Bankr.L.J. 55, 59 (1985). This policy ensures the consistency of application of federal law by bankruptcy judges with expertise in bankruptcy law in dealing with questions of dischargeability. However, the policy of exclusive jurisdiction is not implicated when one bankruptcy court considers the question of collateral estoppel, or issue preclusion, as distinguished from claim preclusion, in the light of issues that were fully and thoroughly litigated in an earlier suit in another bankruptcy court. When a bankruptcy court makes a previous final finding of fraud after vigorous litigation between a creditor and the debtor and the determination is essential to the court's decision, issue preclusion between the same parties in a subsequent dischargeability case in another bankruptcy court should apply. This is especially significant because, as noted by Professor Ferriell, the bankruptcy courts are not in total agreement over the appropriate standard of proof in dischargeability cases, and while most courts apply a clear and convincing standard of proof, a few courts employ a preponderance of the evidence test. Ferriell, *The Preclusive Effect of State Court Decisions in Bankruptcy*, 58 Am.Bankr. L.J. 349, 362 (1984). *Compare Peoples Security Finance, Inc. v. Aldrich (In re Aldrich)*, 16 B.R. 825, 828 (Bkrtcy.W.D.Ky. 1982) ("clear, cogent and convincing evidence" required under § 523(a)(2)) *with de Bottari v. Baiata (In re Baiata)*, 12 B.R. 813, 817 (Bkrtcy.E.D.N.Y.1981) (fair preponderance of the evidence test) *and Semmerling Fence & Supply, Inc. v. Ramos (In re Ramos)*, 8 B.R. 490, 493 (Bkrtcy.W. D.Wisc.1981) (preponderance of the evidence standard applied in a discharge case). Furthermore, allowing the same parties to relitigate issues previously fully litigated in another bankruptcy court would violate the policy of judicial economy and encourage the possibility of inconsistent judgments. In any event, while the Ohio Bankruptcy Court referred in one instance to unexplained gaps in Telecasting's records for 1977 and 1978 that produced an inference to be drawn "by a preponderance of the evidence" that a certain purchase lacked consideration, 23 B.R. at 918, the overwhelming evidence before the court established fraudulent conduct by clear and convincing, if not conclusive, proof. Indeed, the Ohio Bankruptcy Court characterized the debtor's misconduct in the following language:

An examination of the Overmyer case presently before the Court indicates that

fraud and deceit have come a long way since 1601. This Court has heard evidence of and witnessed fraudulent and deceitful manipulation of facts, corporate fictions and the court system. This Court has never encountered such a systematic distortion of truth and the legal system. However, as clever as Mr. Overmyer's system was, it still left numerous "badges of fraud."

23 B.R. at 917.

In affirming the findings of the Ohio Bankruptcy Court the District Court for the Northern District of Ohio said:

> In furtherance of this scheme to defraud, Mr. Overmyer developed a combination of the classic deceptions known as a shell game and a pyramid scheme. First, the various corporate entities were used as shells to hide the assets fraudulently removed from Telecasting and various other Overmyer entities. Then the assets would be transferred without valid consideration and by using backdated documents or leases from corporate entity to entity leaving F.N.B.B. and the bankruptcy courts trying to ascertain the whereabouts of the property. In addition, to complicate the scheme, Mr. Overmyer created layer after layer of corporate entites [sic] in an attempt to conceal the fraud. At the bottom layer of this pyramid of corporate entities, the corporations accumulated massive debts and liabilities while constantly transferring any assets accumulated to the debt-free corporations at the top of the pyramid. An example of this layering can be seen by tracing the ownership of one of the intervening corporations. A.G.G. Projects, Inc. is a corporation that provided "management services" for various Overmyer companies and was owned by Jeebs Distribution, which was owned by Weathervane Farms, Inc., which was owned by the Barbara Overmyer Strang Trust and the Harrison Overmyer Trust. *The record is clear* that the Overmyer Intervenors were totally controlled by Daniel H. Overmyer, and that there was such a unity of interest between Mr. Overmyer and these intervening parties

> that *the findings of the bankruptcy court must be binding upon all of the parties to the fraud.* Although the law will ordinarily treat corporations such as the Overmyer Intervenors as entities distinct from their owners, whenever it is necessary to relieve a fraud the individual corporate entities shall be disregarded. *Lakota Girl Scout Council, Inc. v. Havey Fund-Rais. Man., Inc.,* 519 F.2d 634 (8th Cir.1975); *International Controls Corp. v. Vesco,* 490 F.2d 1334 (2d Cir. 1974), *cert. denied,* 417 U.S. 932 [94 S.Ct. 2644, 41 L.Ed.2d 236] (1974); *In re Gibraltor Amusements, Ltd.,* 291 F.2d 22, 24 (2d Cir.1961). The Overmyer Intervenors are merely the alter ego of Mr. Overmyer and were used as a front or mere conduit by him to carry out his fraudulent scheme. Thus, the assets and property obtained as a result of the fraud against the appellants can be impressed with a constructive trust to affectuate [sic] a remedy in a court of equity.

*Hadar Leasing International Co., Inc. v. D.H. Overmyer Telecasting Co., Inc. (In re D.H. Overmyer Telecasting Co., Inc.),* No. 53 B.R. 963, 983–84 (N.D.Ohio 1984) (emphasis added).

## TELECASTING'S COMPLAINT ALLEGING FIDUCIARY FRAUD OR DEFALCATION—COUNT 19

A debt for fraud or defalcation while acting in a fiduciary capacity is nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(4). The debtor was an officer and director of the plaintiff, Telecasting. "A director is a fiduciary." *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). Telecasting was a wholly-owned subsidiary of TOC. Telecasting and TOC are debtors in possession, having filed Chapter XI petitions in the Southern District of New York on August 24, 1976 and December 15, 1975, respectively. The Telecasting petition was dismissed in September 1980, on the ground that Telecasting was solvent at the time the

petition was filed. Thereafter, on February 6, 1981, Telecasting filed a petition pursuant to Chapter 11 of the current Bankruptcy Code in the Southern District of New York. The Ohio Bankruptcy Court found that until March 1981, the debtor controlled Telecasting and made all the major decisions in connection with Telecasting in the non-broadcasting area. 23 B.R. at 888–89. The liability of the debtor for damages caused to Telecasting arose out of his fiduciary capacity as expressly found by that court:

> Mr. Overmyer and the other officers and directors of Telecasting dominated by him failed to carry out their fiduciary obligations to that corporation, and have thereby caused damage to Telecasting and FNBB.

23 B.R. at 931. Based on this finding, the Ohio Bankruptcy Court held that the debtor and his controlled corporations were indebted to Telecasting in the amount of $2,520,240.02, 23 B.R. at 932. That amount, together with punitive damages and interest, forms the basis for Telecasting's claim in this case for which partial summary judgment is sought.

■■■ The debtor's liability to Telecasting for fiduciary fraud is the same issue involved in the Ohio case; it was actually litigated; it was determined by a valid and final judgment and its determination was essential to the prior judgment. Accordingly, the debtor is now collaterally estopped from denying this liability. The liability of corporate officers and directors to the corporation is not dischargeable when bottomed on fiduciary fraud. *See, e.g., John P. Maguire & Co. v. Herzog,* 421 F.2d 419, 421 (5th Cir.1970); *In re Hammond,* 98 F.2d 703, 705 (2d Cir.), *cert. denied,* 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938); *In re Bernard,* 87 F.2d 705, 707 (2d Cir.1937); *Black's, Inc., v. Decker (In re Decker),* 36 B.R. 452, 457 (D.N.D.1983); 1 W. Norton, Bankruptcy Law and Practice § 27.50 (1981). Telecasting is therefore entitled to a partial summary judgment with respect to the fiduciary fraud exception in 11 U.S.C. § 523(a)(4), as embraced in Count 19 of the amended complaint.

## TELECASTING'S COMPLAINT ALLEGING EMBEZZLEMENT OR LARCENY—COUNT 21

A debtor's liability for embezzlement or larceny is excepted from discharge in 11 U.S.C. § 523(a)(4) regardless of the existence of a fiduciary capacity. Telecasting's claim in the Ohio Bankruptcy Court was not based on any guaranty. The debtor was directed "to make restitution to Telecasting for fraud...." 23 B.R. at 932. It was found that funds and assets were willfully misappropriated from Telecasting through Hadar, a debtor-controlled entity, and were received or used for the benefit of the debtor personally. The debtor's liability to Telecasting included this misappropriation as well as intentional misappropriation of Telecasting's assets by the debtor and others under his control with the result that an additional award of $100,000 in punitive damages was imposed against the debtor in favor of Telecasting. These findings were expressed as follows:

> *The Hadar Conduit.* Hadar was a mere conduit by which Mr. Overmyer could and did covertly misappropriate Telecasting's funds.

23 B.R. at 873.

\* \* \* \* \* \*

> Under the circumstances, it is a reasonable inference that the money for the purchase of the farm owned by Weathervane Farms, Inc. was taken from Telecasting without consideration and with deliberate, actual intent to hinder, delay and defraud FNBB in the collection of obligations to TOC, DHO, ODS and Mr. Overmyer.

23 B.R. at 878–79.

\* \* \* \* \* \*

> During calendar year 1980 alone, Mr. Overmyer took $37,235 in cash out of Telecasting through this petty cash scheme.

23 B.R. at 880.

\* \* \* \* \* \*

In view of the facts regarding Mr. Overmyer's continual diversion of Telecasting's assets and his overall scheme to remove his personal assets from the prospective reach of his creditors, including particularly FNBB's claim on his personal guarantees, these sworn statements were knowingly false.

23 B.R. at 893.

\* \* \* \* \* \*

The service agreements with Hadar are back dated fabrications and, like the service agreements made directly with Telecasting, were engineered by Mr. Overmyer to siphon and fraudulently transfer, for his personal use, enormous sums of money from Telecasting for grossly unfair consideration. ... The record before this Court demonstrates that the payments on the leaseholds at 3 and 4 Park Avenue came from Telecasting and were transferred by Mr. Overmyer with actual intent to defraud FNBB.

23 B.R. at 918.

\* \* \* \* \* \*

Based upon the "badges of fraud", as heretofore described, this Court concludes that Mr. Overmyer transferred real property among his corporations, transferred stock to trusts and transferred money out of Telecasting with the actual intent to hinder and delay the claims of FNBB and other creditors.

23 B.R. at 922.

\* \* \* \* \* \*

Mr. Overmyer's pursuit of this scheme has involved ... the submission of sworn affidavits to several courts by Mr. Overmyer, stating that FNBB would not be harmed by further delay in the enforcement of its security interest in Telecasting's capital stock while he continued to fraudulently extract money from Telecasting; ... and to take advantage of the delay and confusion engendered by the existence of multiple forums, pitting one court against another, thereby permitting Mr. Overmyer to siphon funds from Telecasting and to fraudulently convey his own and any other assets FNBB might reach to satisfy its claims.

*Id.*

\* \* \* \* \* \*

Mr. Overmyer intentionally misrepresented in his affidavits that FNBB would not be harmed by delay in the enforcement of its security interest in the capital stock of Telecasting. These statements delayed FNBB's ability to enforce its security interest while allowing Mr. Overmyer to continue to siphon moneys from Telecasting, thereby depriving FNBB of its claim.

*Id.*

\* \* \* \* \* \*

The Hadar leases are shams designed to conceal the looting of Telecasting by Mr. Overmyer.

23 B.R. at 930.

\* \* \* \* \* \*

The service agreements between Telecasting and the service companies and between Hadar and the service companies are shams designed to conceal the looting of Telecasting by Mr. Overmyer.

*Id.*

\* \* \* \* \* \*

The June 19, 1979, General Electric settlement was a fraud on the Bankruptcy Court, a misappropriation of Telecasting's assets by Mr. Overmyer and his agents, including Mr. Connery, and a fraudulent conveyance as to FNBB.

*Id.*

\* \* \* \* \* \*

The storage agreements that Mr. Overmyer caused to be imposed on Telecasting by Weathervane Farms, Inc. were shams designed to conceal the looting of Telecasting by Mr. Overmyer, and the payments of money by Telecasting pursuant thereto were fraudulent conveyances as to FNBB.

*Id.*

\* \* \* \* \* \*

The making of the Hadar leases constituted fraudulent conveyances from Telecasting to Hadar.

*Id.*

\* \* \* \* \* \*

Hadar has commingled advances and deposits of Telecasting, thereby converting Telecasting's moneys and entitling Telecasting to the immediate return of all of Telecasting's deposits.

23 B.R. at 931 (footnote omitted).

▇▇▇ From the foregoing findings it is evident that the Ohio Bankruptcy Court found that the debtor's liability to Telecasting was predicated on a knowing and willful misapplication or conversion of Telecasting's assets and funds by the debtor and those under his control while such assets and funds were in the debtor's hands or under his aegis. The term "embezzlement" for purposes of nondischargeability is not defined in 11 U.S.C. § 523(a)(4). However, a fraudulent misappropriation of funds by a debtor is sufficient to hold a liability arising out of such conduct as nondischargeable embezzlement. *Great American Insurance Co. v. Graziano (In re Graziano)*, 35 B.R. 589, 596 (Bkrtcy.E.D.N.Y.1983); 1 W. Norton, Bankruptcy Law and Practice § 27.55 n. 4 (1981); 3 Collier on Bankruptcy § 523.14[3], at 523-116 (L. King 15th ed. 1985). Thus, Telecasting is entitled to a partial summary judgment as to Count 21 of the amended complaint charging nondischargeability of its claim due to embezzlement proscribed under 11 U.S.C. § 523(a)(4).

## TELECASTING'S COMPLAINT ALLEGING WILLFUL AND MALICIOUS INJURY—COUNT 23

▇▇▇ The term "willful" as expressed in 11 U.S.C. § 523(a)(6) is synonymous with "intentional." *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir.1983); *Petty v. Dardar (In re Dardar)*, 620 F.2d 39, 40 (5th Cir.1980) (per curiam); *Masloski v. La Casse (In re La Casse)*, 28 B.R. 214, 217 (Bkrtcy.D.Minn.1983). The Ohio Bankruptcy Court expressly found that the debtor's conduct evidenced an actual intent to de-

fraud. While no specific ill will or hatred was found, an embezzlement of property will suffice to establish a willful and malicious injury to property. *Great American Insurance Co. v. Graziano (In re Graziano)*, 35 B.R. 589 (Bkrtcy.E.D.N.Y.1983). Malice under 11 U.S.C. § 523(a)(6) does not require a showing of hatred or ill will. 1 W. Norton, *supra*, § 27.53 n. 1.50 (Supp. 1984). An intentional conversion of property in knowing disregard of the owner's rights will amount to a willful and malicious injury to property within the meaning of 11 U.S.C. § 523(a)(6). *Beneficial Finance Co. v. Contento (In re Contento)*, 37 B.R. 853, 856 (Bkrtcy.S.D.N.Y.1984).

▇▇▇ The Ohio Bankruptcy Court's finding that the debtor misappropriated Telecasting's property with an intent to defraud the latter so that the debtor was held liable for damages, including a punitive penalty, is binding on the debtor under the doctrine of collateral estoppel. Hence, Telecasting is entitled to partial summary judgment with respect to Count 23 of the amended complaint which asserts the nondischargeability of its claim by reason of the debtor's willful and malicious injury to Telecasting's property within the meaning of 11 U.S.C. § 523(a)(6).

## FNBB'S COMPLAINT ALLEGING FIDUCIARY FRAUD OR DEFALCATION—COUNT 18

FNBB contends that the debtor's obligation to it was incurred in a fiduciary capacity and that the debtor defrauded FNBB and prevented it from realizing on its collateral. FNBB asserts that this fiduciary capacity arose from several relationships.

(1) FNBB states that it was the record shareholder of Telecasting while the debtor was an officer, director and control person of Telecasting. This point is not correct. Telecasting's 249 shares were pledged with FNBB by TOC to secure the balance due on two term loans made by FNBB to D.H. Overmyer Co., Inc. ("DHO") and various subsidiaries in the principal amount of $3,350,000, which was guaranteed by the

debtor and TOC. On June 11, 1980, FNBB was permitted by the Bankruptcy Court in the Southern District of New York to foreclose its lien on the Telecasting stock. Pursuant to an order of the Ohio Bankruptcy Court dated March 25, 1981, FNBB elected a new board of directors of Telecasting and has since controlled its operations. Therefore, during the period that the debtor controlled Telecasting's business, FNBB was not the owner of Telecasting's stock.

■■■■ (2) FNBB also states that it was a secured lender of TOC while the debtor was an officer, director and control person of TOC, whereas TOC had pledged Telecasting's shares to FNBB. Additionally, both TOC and Telecasting were debtors in possession owing debts to FNBB. The fact that FNBB was a secured creditor of TOC and Telecasting, without more, does not establish a fiduciary duty owed to the creditor by the officers in control of the obligor corporation. Such officers owe a fiduciary duty to their corporation and the shareholders, but not to the creditors of the corporation. *Murphy & Robinson Investment Co. v. Cross (In re Cross)*, 666 F.2d 873, 880 (5th Cir.1982); *Ealy Campbell Mobile Homes, Inc. v. Whitlock (In re Whitlock)*, 449 F.Supp. 1383, 1388 (W.D. Mo.1978); *Kelley v. Conwed Corp.*, 429 F.Supp. 969, 971–72 (E.D.Va.1977).

■■■■ (3) FNBB asserts that its fiduciary relationship with the debtor is based not only on his control of corporations of which FNBB was a secured creditor, but also on the many covenants contained in the loan agreements between FNBB and various Overmyer companies. This point raises an obvious question of fact since the loan agreements are not part of the motion for partial summary judgment.

Having failed to establish a fiduciary capacity as a matter of law, the movants request for partial summary judgment as to County 18 must be denied.

## FNBB'S COMPLAINT ALLEGING EMBEZZLEMENT OR LARCENY—COUNT 20

■■■ Although the Ohio Bankruptcy Court's findings amply support the conclusion that the debtor willfully misappropriated funds and assets from Telecasting in order to frustrate FNBB's efforts to collect the obligations of Overmyer-controlled entities to FNBB and to prevent FNBB from foreclosing on its collateral, there was no finding that the debtor misappropriated any funds or assets directly from FNBB. The debtor's misconduct and fraud were directed toward depriving FNBB of its valid claims. That the debtor was found to have perpetrated a dishonest scheme by fraudulently transferring assets under his control so as to deprive FNBB from realizing on its claim, does not mean that the debtor's conduct amounted to embezzlement or larceny against FNBB for purposes of collateral estoppel. Accordingly, FNBB's motion for partial summary judgment with respect to Count 20 must be denied.

## FNBB'S COMPLAINT ALLEGING WILLFUL AND MALICIOUS INJURY—COUNT 22

■■■ There was no finding by the Ohio Bankruptcy Court that the original loans obtained from FNBB, which were guaranteed by the debtor, were tainted by any fraudulent conduct when they were obtained. Accordingly, the debtor correctly asserts that subsequent fraudulent conduct with respect to obligations validly obtained will not affect the dischargeability of the original obligation when there was no fraud at its inception. *See, e.g., Barch v. Cokkinias (In re Cokkinias)*, 28 B.R. 304, 307 (Bkrtcy.D.Mass.1983). Nevertheless, the debtor was found to have engaged in fraudulent conduct from 1973, after the execution of his guarantees, with the actual intent to defraud FNBB so as to delay, prevent and deprive FNBB from collecting its claims, thereby causing damage to FNBB, including substantial collection expenses and the possible loss of its collateral. For this willful injury to FNBB's property, the debtor was also assessed punitive damages in favor of FNBB in the

amount of $150,000. This willful injury to FNBB's property interests, in knowing disregard of FNBB's rights, constitutes a willful and malicious injury to property, as expressed in 11 U.S.C. § 523(a)(6). *See Seven Elves, Inc. v. Eskenazi*, 704 F.2d at 245 ("Willful means intentional and malicious adds the absence of just cause or excuse."); *Beneficial Finance Co. v. Contento (In re Contento)*, 37 B.R. at 856. The findings comprising this ground were expressed by the Ohio Bankruptcy Court as follows:

> Mr. Connery and Mr. Overmyer used the multilevel corporate structure of having Weathervane Farms, Inc. own Jeebs and Jeebs own AGG, in an effort to isolate Weathervane Farms, Inc. from liability for the large debts of Jeebs and AGG to Hadar and Telecasting, with deliberate, actual intent to hinder, delay and defraud the honest creditors of Telecasting in general, and FNBB in particular in its efforts to collect the obligations of TOC, DHO, ODS and Mr. Overmyer.

23 B.R. at 879.

\* \* \* \* \* \*

*Mr. Overmyer's Misrepresentations.* The Overmyer organization has, since 1973, been in continuous litigation.... In that time, Mr. Overmyer has deliberately caused to be created intentionally misleading and misrepresentative evidence in the court system in attempts to frustrate FNBB's right to foreclose upon its collateral in order to protect its most valuable asset, the capital stock of Telecasting.

23 B.R. at 893.

\* \* \* \* \* \*

> The evidence in this case has established conclusively that Mr. Overmyer exercises complete and full control over his corporate nominees, Weathervane, Intermodal and Jeebs.... The purpose of Mr. Overmyer's transfers from Telecasting to Weathervane and Jeebs and from himself to Intermodal was to deprive FNBB of the value of its security and guarantee of its loan, and to personally enrich Mr. Overmyer and his immediate family. That purpose, combined with the transfers failing to be supported by fair consideration, enables the inference of an intent by Mr. Overmyer to defraud FNBB.

23 B.R. at 919.

\* \* \* \* \* \*

> Another "badge of fraud" tending to prove Mr. Overmyer's actual fraudulent intentions is his 1973 transfer of the stock of at least 15 of his nominee corporations, including Weathervane, Intermodal, Hadar and ISLI, to trusts for the benefit of his immediate family. These transfers were made with actual intent to defraud FNBB.

*Id.*

\* \* \* \* \* \*

> Mr. Overmyer also manipulated the judicial system to prevent FNBB from discovering his fraudulent transactions and to wrongfully deprive FNBB of its valid claims.

23 B.R. at 922.

\* \* \* \* \* \*

> All dealings of Telecasting with the Overmyer family and other Overmyer companies since 1973 have been frauds on FNBB.

23 B.R. at 929.

\* \* \* \* \* \*

> Mr. Overmyer's control of the various Overmyer companies, including TOC, DHO, ODS, Hadar, ISLI, Jeebs, AGG, Omega, Intermodal Terminals, Inc., Weathervane Farms, Inc., Deauville Private Rental Homes, Inc., Peerless, NDS, NDS of California, RT Systems and its subsidiaries and Expediter, is so pervasive that the unity of interest between Mr. Overmyer and these corporations makes it inequitable to treat the corporations as separate legal entities. Mr. Overmyer is, therefore, liable for the obligations of every such corporation, and every such corporation is, therefore, lia-

ble for the obligations both of Mr. Overmyer and of every other corporation.

23 B.R. at 930.

\* \* \* \* \* \*

The creation of fictitious corporate records and false books of account, and the destruction of accounting records, by the Overmyer organization in general and by Mr. Overmyer, Mr. Connery and Mr. Chi in particular, were frauds on FNBB.

23 B.R. at 930–31.

\* \* \* \* \* \*

Mr. Overmyer, with and through his companies and agents, has deliberately and willfully subverted the judicial process in this and other courts as part of a scheme to obstruct justice and to hinder, delay and defraud FNBB.

23 B.R. at 931.

\* \* \* \* \* \*

Mr. Overmyer has used Jeebs, AGG, Omega and Deauville Private Rental Homes, Inc., as well as secret Bermuda bank accounts, to support his legal maneuvering and thereby aid in defrauding FNBB.

*Id.*

\* \* \* \* \* \*

Mr. Connery has actively advanced the fraudulent scheme perpetrated by Mr. Overmyer on FNBB, and has thereby caused damage to FNBB.

23 B.R. at 932.

\* \* \* \* \* \*

Mr. Chi has knowingly participated in the fraudulent scheme perpetrated by Mr. Overmyer on FNBB, and has thereby caused damage to FNBB.

*Id.*

\* \* \* \* \* \*

Mr. Overmyer is liable to FNBB for $150,000.00 plus interest as punitive damages for his fraud.

23 B.R. at 939.

FNBB's proof of claim in this case, in the amount of $23,016,980.31, is based upon a four part judgment rendered by the Ohio Bankruptcy Court. Part 1 of the judgment, $11,723,754.53, represents unpaid principal and interest on two term loans made by FNBB; part 2 of the judgment is based on the unpaid balance of $171,947.76 of an assigned accounts loan; part 3 reflects overdrafts on the combined Overmyer "mother" account of $6,230,742.07; and part 4 awards costs of collection in the sum of $4,267,330.91. Each of these obligations is computed as of March 1982, when the trial in the Ohio Bankruptcy Court was commenced. However, in the fall of 1973, when the debtor first began to orchestrate the fraudulent transfers and to engage in other willful and malicious conduct described in the opinions of the Ohio Bankruptcy and District Courts, his total indebtedness to FNBB was approximately $4,431,777.68, representing a $3,350,000 principal balance due on the term loans, $81,777.68 on the assigned accounts loan and approximately $1,000,000 of overdrafts. These advances were validly obtained by DHO and various other Overmyer entities without any taint of fraud.

It is apparent that there was an increase of approximately $17,961,997.59 of indebtedness to FNBB from the time of the debtor's initial intentional fraudulent conduct in delaying FNBB from collecting its claims. Thus, $17,961,997.59 constitutes the actual damages that were inflicted upon FNBB by the debtor's willful and malicious injury to FNBB's property rights. Additionally, the Ohio Bankruptcy Court assessed the debtor with punitive damages in favor of FNBB in the amount of $150,000.

The debtor is collaterally estopped from denying that the Ohio Bankruptcy Court's award to FNBB, to the extent of $18,111,-997.59 plus interest as allowed by the Ohio Court, represents a nondischargeable obligation to FNBB incurred pursuant to 11 U.S.C. § 523(a)(6), as a result of his willful and malicious injury to FNBB, as found by that court. Accordingly, FNBB is entitled to a partial summary judgment in the amount of $18,111,997.59 plus the prescribed amount of interest with respect to Count 22 of the complaint.

CONCLUSIONS OF LAW

1. The debtor is collaterally estopped from contesting the findings of fact in *Hadar Leasing International Co., Inc. v. D.H. Overmyer Telecasting Co., Inc. (In re D.H. Overmyer Telecasting Co., Inc.)*, 23 B.R. 823 (Bkrtcy.N.D.Ohio 1982) *aff'd*, 53 B.R. 963 (N.D.Ohio 1984) and in *First National Bank of Boston v. Overmyer Company, Inc. (In re Overmyer Company, Inc.)*, 2 B.C.D. 992 (Bkrtcy.S.D.N.Y.1976), *aff'd*, 697 F.2d 295 (2d Cir.1982).

2. Telecasting is entitled to an order for partial summary judgment for $3,557,008.14 with respect to the nondischargeability of its claim against the debtor arising out of fiduciary fraud pursuant to 11 U.S.C. § 523(a)(4), as embraced in Count 19 of the amended complaint.

3. Telecasting is entitled to an order for partial summary judgment for $3,557,008.14 with respect to the nondischargeability of its claim against the debtor arising out of embezzlement pursuant to 11 U.S.C. § 523(a)(4), as contained in Count 21 of the amended complaint.

4. Telecasting is entitled to an order for partial summary judgment for $3,557,008.14 with respect to the nondischargeability of its claim against the debtor arising out of willful and malicious injury to Telecasting's property pursuant to 11 U.S.C. § 523(a)(6), as set forth in Count 23 of the amended complaint.

5. FNBB's motion for partial summary judgment for $23,016,980.31 with respect to the nondischargeability of its claim against the debtor arising out of an alleged fiduciary fraud or fiduciary defalcation pursuant to 11 U.S.C. § 523(a)(4), as expressed in Count 18 of the amended complaint, is denied.

6. FNBB's motion for partial summary judgment for $23,016,980.31 with respect to the nondischargeability of its claim against the debtor arising out of an alleged embezzlement or larceny pursuant to 11 U.S.C. § 523(a)(4), as described in Count 20 of the amended complaint, is denied.

7. FNBB's motion for partial summary judgment for $23,016,980.31 with respect to the nondischargeability of its claim against the debtor arising out of a willful and malicious injury to FNBB's property pursuant to 11 U.S.C. § 523(a)(6), as stated in Count 22 of the amended complaint, is granted to the extent of $18,111,997.59 plus interest as allowed in the judgment of the Ohio Bankruptcy Court, and is denied as to the balance of the claim.

SETTLE ORDER FOR JUDGMENT on notice in accordance with the foregoing.