In re COMMODORE INTERNATION-
AL, LIMITED, and Commodore Elec-
tronics, Limited, Debtors.

Official Committee of Unsecured
Creditors, Plaintiffs,

v.

Transpacific Corporation
Ltd., Defendant.

Bankruptcy Nos. 94 B 42185(JLG),
94 B 42386(JLG).
Adversary Nos. 97/8294A.

United States Bankruptcy Court,
S.D. New York.

Dec. 15, 1999.

Stroock, Stroock & Lavan, LLP, New York City, for the Committee.

Kronish, Lieb, Weiner & Hellman, LLP, New York City, for Transpacific Company Ltd.

## MEMORANDUM DECISION ON TRANSPACIFIC COMPANY'S MOTION TO DISMISS

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Transpacific Company Ltd. ("TPC")[1] moves pursuant to Fed.R.Bankr.P. 7004, 7012, and 7041 and Fed.R.Civ.P. 4(m), 12(b)(2)–(6) and 41(a) for an order dismissing the complaint in this adversary proceeding (the "Complaint"). The unsecured creditors' committee appointed herein (the "Committee") opposes the motion. We grant it.

### Facts

The relevant facts are not disputed. Commodore International, Limited ("CIL") is the parent company of Commodore Electronics, Limited ("CEL", and together with CIL, the "debtors") and other affiliated entities formerly engaged in the world-wide manufacture of personal computers and related products under the "Commodore" and "Amiga" brand names. CIL and CEL are Bahamian corporations and are the subject of liquidation proceedings pending in the Supreme Court for the Commonwealth of The Bahamas (the "Bahamas Supreme Court"). Franklyn R. Wilson and MacGregor N. Robinson (the "Liquidators") are the court-appointed liquidators of those entities. CIL and CEL also are chapter 11 debtors in this court. Both courts approved a protocol (the "Protocol") in an effort to coordinate and harmonize these dual insolvency proceedings.

By order dated on or about March 13, 1997, as supplemented by one dated on or about April 12, 1997, we authorized the Committee, on behalf of the debtors, to pursue preferential transfer claims against various third parties in the United States. On or about April 4, 1997, the Committee commenced this action. In the Complaint, the Committee seeks to avoid certain payments by the debtors to TPC totaling approximately $10 million as preferences and/or fraudulent transfers under §§ 547(b), 548 and 550 of the Bankruptcy Code. More specifically, it alleges that: (i) on or about February 26, 1993, TPC entered into an agreement to advance $10,000,000 to CEL, in return for which CEL gave an interest bearing demand promissory note in the same amount (see Complaint ¶ 11); (ii) on or about April 12, 1993, TPC entered into an agreement to advance CEL another $7,000,000, in return for which CEL gave TPC a new interest-bearing demand promissory note in the amount of $17,000,000 (id. ¶ 12); (iii) on or about April 13, 1993, CEL and certain of its subsidiaries gave TPC a security interest in their inventory and accounts receivable and a pledge of certain stock as security for the $17,000,000 loan (id. ¶ 13); (iv) on or about May 24, 1993, CEL's German subsidiary transferred inventory with a value of $9,500,000 to TPC in partial payment of the $17,000,000 loan to CEL (id. ¶ 14); (v) the security agreements were amended thereafter so that CEL's obligation to TPC was secured by the proceeds of the sale of certain of CEL's German subsidiary's inventory (id. ¶ 15); (vi) on or about November 8, 1993, CEL paid TPC $9,891,039 in partial satisfaction of its obligation to TPC (id. ¶ 16); and (vii) TPC received additional funds thereafter, the amount of which is not currently known, from CEL's German subsidiary. Id. ¶ 17. Accordingly, the Committee alleges that the $9,891,039 payment by CEL on November 8, 1993 to TPC in partial satisfaction of CEL's $17 million debt to TPC, and the granting of security interests by CEL to TPC on or about April 13, 1993 to secure that debt, are avoidable as preferential and/or fraudulent transfers under

---

1. TPC is erroneously referred to as "Transpacific Corporation Ltd." in the Complaint.

§§ 547, 544(b) and 548 of the Bankruptcy Code. *Id.* ¶¶ 22, 27.

TPC has not filed an answer. Instead, it seeks to dismiss the Complaint on the basis of lack of jurisdiction, lack of standing, collateral estoppel, comity, forum non conveniens, the contractual obligation to litigate in the Bahamas and the non-extra-territorial reach of the avoidance provisions of the Bankruptcy Code. We address each of these below.

### Discussion

We have subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(F) and (H).

Fed.R.Bankr.P. 7012 makes Fed. R.Civ.P. 12 applicable herein. As TPC's motion pertains to that rule, TPC contends that the Complaint must be dismissed under subsections (2) through (6), which address, respectively, personal jurisdiction, venue, sufficiency of process and the legal sufficiency of the Committee's claims in the Complaint. In determining those issues, we have considered both the allegations in the Complaint as well as affidavits and other materials submitted by the parties. Were this a motion pursuant to Rule 12(b)(6), our consideration of matters outside of the pleadings would mean that we were treating it as one for summary judgment under Rule 56. *See* Fed.R.Civ.P. 12(b). However, the only defenses raised by TPC that might arguably fall under the rubric of Rule 12(b)(6)—*i.e.* lack of standing, comity, contractual choice of forum and forum non-conveniens—are more appropriately addressed to the propriety of our subject matter jurisdiction (Fed. R.Civ.P. 12(b)(1)) or the proper venue for this action (Fed.R.Civ.P. 12(b)(3)). *See Thompson v. County of Franklin,* 15 F.3d 245, 247 (2d Cir.1994) (finding that although lack of standing defense may be raised under Rule 12(b)(6), it is more properly directed to Rule 12(b)(1)); *Leonard v. Garantia Banking Ltd.,* No. 98 Civ. 4848, 1999 WL 944802, *1 (S.D.N.Y. Oct. 19, 1999) (dismissing complaint on basis of forum non conveniens and contractual forum selection clause under Rule 12(b)(3)); *Filetech S.A.R.L. v. France Telecom,* 978 F.Supp. 464, 482 n. 16 (S.D.N.Y.1997) (where party did not specify which subsection of Rule 12(b) it was moving under court could consider materials outside complaint in deciding motion to dismiss on grounds of international comity without converting motion to one for summary judgment by treating motion as one pursuant to Rule 12(b)(1)), *vacated on other grounds,* 157 F.3d 922 (2d Cir.1998); *see also Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991) (on a "challeng[e] [to] the ... court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits").

### Standing

■ TPC claims that the Committee lacks standing to sue and that we should dismiss this case in light of the Bahamas Supreme Court's determination on December 8, 1997 that the Liquidators did not have authority under Bahamian law to consent to the Committee's prosecution of this action. *See Gould v. Commodore International Limited (In Liquidation),* No. 665 (S.Ct. Bahamas Dec. 8, 1997). According to TPC, the Committee is collaterally estopped by *Gould* from relitigating its standing to maintain this proceeding because: (i) *Gould* represents a final judgment on the merits of the Liquidators' purported assignment to the Committee of the right to litigate on the debtors' behalf; (ii) the issue raised here by the Committee is the same issue that was decided in *Gould;* (iii) the Committee is in privity with the party against whom that issue was decided in *Gould*—i.e. the Liquidators; and (iv) the Liquidators (privies to

the Committee) had a full and fair opportunity in *Gould* to litigate the validity of the assignment.

The Committee contends that it is not estopped by *Gould* from arguing that it has standing to maintain this proceeding because *Gould* explicitly provides that it is not binding on the Committee. It also asserts that TPC's argument is an impermissible effort to manipulate the litigation process by attempting to bind the Committee with a decision in which the Committee was denied the opportunity to be heard, and that to do so would be fundamentally unfair. Finally, the Committee maintains that we would violate the terms of the Protocol if we accepted TPC's argument.

 Collateral estoppel, or issue preclusion, "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." *Burgos v. Hopkins*, 14 F.3d 787, 792 (2d Cir.1994); *see also* Charles Alan Wright, *The Law of Federal Courts*, § 100A at 730 (5th ed.1994). It will apply when: (i) the subject issue in both proceedings is identical; (ii) the issue was litigated and necessarily decided; (iii) there was a full and fair opportunity to litigate in the prior proceeding; and (iv) resolution of the issue was necessary to support a valid and final judgment. *See Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa*, 56 F.3d 359, 368 (2d Cir.1995); *Liona Corp., Inc. v. PCH Associates (In re PCH Associates)*, 949 F.2d 585, 593 (2d Cir.1991); *First National Bank v. Overmyer (In re Overmyer)*, 52 B.R. 111, 115 (Bankr. S.D.N.Y.1985).

In *Gould*, the Bahamas Supreme Court held that the Liquidators were required to obtain its permission prior to delegating authority to the Committee to bring suit based upon causes of action belonging to the debtors. In doing so, it construed the relevant provision of the Protocol and concluded, among other things, that notwithstanding Protocol ¶ M(6), which provides that the Liquidators are authorized to "cause CEL or CIL to commence material legal proceedings" in the U.S., that right is expressly qualified by the caveat "provided that such actions are taken in accordance with Bahamian law, including the making of such orders of the [Bahamas] Supreme Court as may be required". *See* Protocol ¶ M. It then found that under Bahamian law the Liquidators were obligated to obtain its permission before delegating that authority to anyone. The Bahamas Supreme Court denied the Committee's motion to intervene in the litigation, stating in part that "[t]he primary concern of the Committee is, as I perceive it, having the stayed action commenced by it against the director and officers proceed in the Bankruptcy Court. Any order made on application before me is not decisive of that." *See Gould* p. 17.

The Committee maintains that the Bahamas Supreme Court erred in *Gould* by ignoring crucial provisions in the Protocol vesting this court with the sole governance of these chapter 11 proceedings (Protocol ¶ D), which correspondingly delimit that court's authority to liquidations conducted before it. *See id.* ¶ C. According to the Committee, by relying instead on, and misreading, Protocol ¶ M, the Supreme Court erred because that provision does not specifically address a situation where we have explicitly authorized the pursuit of litigation. In essence, the Committee asks us to disregard the court's ruling in *Gould*. We will not do so.

Regardless of whether the Committee and the Liquidators can be deemed in privity to one another in that litigation, the issue that the Bahamas Supreme Court decided in *Gould* is not the same issue before us, although it is clearly a related one. That issue was whether the Liquidators—as court appointed fiduciaries subject to Bahamian law—could authorize anyone else to commence suit based upon causes of action belonging to the estates of insolvent Bahamian companies without

first obtaining the permission of the Bahamas Supreme Court. The court concluded that they could not. Neither the Committee nor TPC is asking us to decide that issue in connection with this motion to dismiss.

However, the Committee's standing to maintain this action is predicated upon the authority delegated by the Liquidators. The Committee chose to rely on the ostensible validity of that delegation when it commenced this proceeding, rather than attempting to plumb the bona fides of the Liquidators' actions. Had it been otherwise, that issue might have been determined long before the Bahamas Supreme Court issued *Gould*. In any case, the Committee assumed the risk that its mandate to litigate this proceeding might prove to be illusory. *Gould* indicates that it was. We accordingly find that the Complaint must be dismissed because the Committee lacks standing to prosecute these avoidance actions on behalf of the estate.

### Personal Jurisdiction

TPC also seeks dismissal pursuant to Fed.R.Civ.P. 12(b)(2) [2] on the grounds that we lack personal jurisdiction over it, a nonresident defendant incorporated in the Bahamas, because TPC is not qualified to do business in the U.S., in fact does not conduct systematic business in the U.S. and is not generally subject to jurisdiction here. In addition, TPC maintains that we lack specific jurisdiction over it because it did not purposefully direct its activities at residents of this country, and the economic center of gravity of the loan and security transactions upon which the Committee's claims are predicated was in the Bahamas. According to TPC, it's loans to CEL, which were funded by TPC from Nassau, and their partial repayment in Nassau with money apparently transferred from Switzerland out of the proceeds of a Japanese tax refund, do not provide the necessary intentional minimum contacts with

the U.S. to form a basis for personal jurisdiction. Those loans, it claims, were to be repaid to it in the Bahamas, and were secured only by offshore assets. TPC also asserts that it deliberately sought, bargained for, and conditioned its loans to CEL on the exclusive protections of Bahamian law and jurisdiction. It claims that, as a Bahamian entity, it never would have agreed to make the loans to CEL if it thought it would be subjected to the jurisdiction of a foreign court as a consequence. According to TPC, the entirely ministerial and incidental acts of actually receiving and signing certain loan documents in the U.S. do not represent its deliberate acceptance of the protections of American law or injection into local commerce.

▮ The Committee must establish our jurisdiction over TPC. *See Falik v. Smith,* 884 F.Supp. 862, 864 (S.D.N.Y. 1995); *Central Gulf Lines, Inc. v. Cooper/T. Smith Stevedoring,* 664 F.Supp. 127, 129 (S.D.N.Y.1987). We look to New York law to determine if it has done so. *Levisohn, Lerner, Berger & Langsam v. Medical Taping, Inc.,* 10 F.Supp.2d 334, 339 (S.D.N.Y.1998) ("In federal court, personal jurisdiction is determined according to the law of the state where the court sits") (citing *Bensusan Restaurant Corp. v. King,* 126 F.3d 25, 27 (2d Cir.1997); *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996)). The Committee does not dispute that TPC is a Bahamian corporation not licensed to do business in New York. It alleges that TPC is owned and controlled by Irving Gould ("Gould"), a former officer and director of CIL, that it has no existence separate and apart from Gould, and that Gould regularly transacted business, including TPC business, from an office in New York. According to it, TPC is the alter ego of Gould, and this being the case, jurisdiction over Gould is a sufficient basis to obtain general jurisdiction over TPC.

---

**2.** Rule 12(b)(2) provides in substance that a complaint may be dismissed due to "lack of personal jurisdiction over the person". Fed. R.Civ.P. 12(b)(2).

*General Jurisdiction*

Section 301 of New York's Civil Practice Law and Rules ("CPLR") states that "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." N.Y.C.P.L.R. § 301 (McKinney 1999). Pursuant to that section, we have general jurisdiction over a foreign corporation, or non-domiciliary, when it is "doing business" here "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915 (1917); *see also Falik*, 884 F.Supp. at 865 ("A nonresident is subject to personal jurisdiction in any cause of action pursuant to section 301 [of the CPLR] if he is 'engaged in such a continuous and systematic course of "doing business" here as to warrant a finding of [his] "presence" in this jurisdiction'") (quotations omitted). "When determining whether a non-domiciliary is doing business in the state, the courts use a 'simple pragmatic' test". *Falik*, 884 F.Supp. at 865; *accord Central Gulf Lines*, 664 F.Supp. at 129. The test is not precise and we may consider the aggregate of the non-domiciliary's activities, including whether it has offices, property, bank accounts, or employees in this state and whether it solicits business in this state, either by itself or through an agent. *See Falik*, 884 F.Supp. at 865; *see Central Gulf Lines*, 664 F.Supp. at 129. In the Complaint, the Committee does not allege, among other things, that TPC (i) maintains offices in this state, (ii) had property, bank accounts or employees here, or (iii) either directly or through an agent solicited business in this state. In fact, the Committee does not allege any facts to show that TPC did any business in this state. Rather, it claims in its legal memoranda that TPC is present in New York through the activities of Gould. Thus, it would have us find that Gould is the alter ego of TPC and that through his activity we can assert jurisdiction over TPC. However, the Committee does not even allege what activities Gould has conducted on behalf of TPC in this state. Instead, it merely surmises that because Gould spent a portion of his time in New York, and because, to the best of its knowledge, he is the president and sole owner of TPC, he must have regularly conducted TPC business while here. "However, if a foreign corporation is not doing business in New York, the mere fact that an officer [is present] in the state does not bring the corporation within the jurisdiction of New York." *Lumbermens Mutual Casualty Co. v. The Borden Co., Inc.*, 265 F.Supp. 99, 103 (S.D.N.Y.1967); *accord Pacamor Bearings, Inc. v. Molon Motors & Coil, Inc.*, 102 A.D.2d 355, 357, 477 N.Y.S.2d 856 (1984) (where foreign corporation not doing business in New York, fact that sales managers and directors made numerous trips to New York was insufficient, even with substantial solicitation activities, to warrant finding it present in New York for purpose of jurisdiction); *Blackburne v. Homasote Co.*, 2 A.D.2d 973, 974, 157 N.Y.S.2d 90 (1956) ("mere presence in this state of officer or director of a foreign corporation not doing business here is not sufficient to confer jurisdiction over the corporation upon courts of this State") (citing *Riverside & Dan River Cotton Mills v. Menefee*, 237 U.S. 189, 35 S.Ct. 579, 59 L.Ed. 910 (1915); *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 115 N.E. 915 (N.Y.1917)).

Moreover, while a foreign corporation's systematic and continuous supervision from New York may be enough to find that the corporation is "doing business" in this state, *see, e.g., Farber v. Zenith Laboratories, Inc.*, 777 F.Supp. 244, 247 (S.D.N.Y.1991), the Committee's assumption that Gould must have been conducting TPC business in New York because he was here cannot suffice at this stage of the litigation to give us jurisdiction over TPC. The Committee contends that, given the opportunity to conduct discovery on this issue, it can uncover evidence to show that Gould's presence here is an adequate basis for asserting general jurisdiction over TPC

under veil piercing principles. The Committee instituted this adversary proceeding over two years ago. Since that time it has obtained discovery pursuant to Fed. R.Bankr.P. 2004, yet has failed to adduce any evidence to support its allegations concerning Gould.[3]

■ It contends that it need only allege facts that would support a prima facie showing of jurisdiction to defeat this Rule 12(b)(2) motion. We disagree. "[A]fter discovery but before the holding of an evidentiary hearing, [which is the posture of this proceeding], [the Committee] must make a prima facie showing of jurisdiction, in which it must aver facts that, if credited by the trier, would suffice to establish jurisdiction over [TPC]." *NationsBank, N.A. v. Macoil, Inc. (In re Med–Atlantic Petroleum Corp.)*, 233 B.R. 644, 655 (Bankr.S.D.N.Y.1999) (citing *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.), *cert. denied*, 519 U.S. 1006, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996); *Madanes v. Madanes*, 981 F.Supp. 241 (S.D.N.Y.1997); *Pilates v. Pilates*, 891 F.Supp. 175, 178 (S.D.N.Y.1995)); *see also Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984) (plaintiff's burden to survive 12(b)(2) motion increases after discovery has been taken); *Mayatextil, S.A. v. Liztex U.S.A., Inc.*, No. 92 Civ. 4528, 1995 WL 131774, *1 (S.D.N.Y. March 23, 1995) ("At any point after substantial discovery, the plaintiff's burden increases and jurisdiction must then be established by a preponderance of the evidence") (citing *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir.1993)). The Committee has failed to aver facts that, if credited, would establish our jurisdiction over TPC pursuant to CPLR § 301.

■ Moreover, even assuming, *arguendo*, that the Committee need only allege a prima facie showing of jurisdiction,

it has still failed to meet its burden. The Committee concedes that Gould is a non-domiciliary. *See* September 28, 1999 Declaration of Curtis C. Mechling ("Mechling Decl.") ¶ 10. It alleges that he was present in New York a portion of each week in his capacity as Chairman of CIL. However, an officer's presence in New York to conduct business for the Corporation does not give us jurisdiction over the person individually. *See Family Internet, Inc. v. Cybernex, Inc.*, No. 98 Civ. 0637, 1999 WL 796177, *4 (S.D.N.Y. Oct. 6, 1999) ("The mere fact that a corporation is subject to jurisdiction under section 301 does not mean that individual officers may be hauled before New York courts without any showing that the individual maintained a presence or conducted business in New York") (citing *Laufer v. Ostrow*, 55 N.Y.2d 305, 313, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982)). Thus, the Committee has not alleged the necessary facts to show jurisdiction over Gould individually, a necessary prerequisite to establish jurisdiction over TPC through Gould in accordance with its alter ego theory. *See, e.g., Rogers v. HSN Direct Joint Venture*, No. 97 Civ. 7710, 1999 WL 322663, *3 (S.D.N.Y. May 20, 1999) (piercing corporate veil on alter ego theory to obtain jurisdiction over foreign corporation through activities of corporate shareholder will not give New York courts jurisdiction where shareholder is not a resident of New York); *People v. World Interactive Gaming Corp.*, No. 404428/98, 1999 WL 591995, *4–5 (N.Y.Sup.Ct. July 22, 1999) (foreign subsidiary found to be doing business in New York for jurisdictional purposes through parent on veil piercing principles only after parent found to be doing business in New York); *Lindsay v. Wrecked and Abandoned Vessel R.M.S. Titanic*, No. 97 Civ. 9248, 1998 WL 557591, *5 (S.D.N.Y. Sept. 2, 1998) (foreign defendant found subject to New York's

---

**3.** In 1996 and 1997, the Committee deposed Mehdi R. Ali, Alexander M. Haig, Jr., Edward Goff, Hock E. Tan, Thomas Matson and Ronald Alexander, all of whom were formerly officers and/or directors of CIL. It never sought to depose Irving Gould, and has not explained why.

jurisdiction on alter ego theory after corporation they controlled was found to be actively doing business in New York).

### Specific Jurisdiction

■ The Committee also argues that we have specific jurisdiction over TPC based on the fraudulent transfers challenged in its Complaint. It claims that TPC has specific ties to the U.S. through Gould and that, contrary to TPC's allegations, CEL also has significant ties to the U.S. According to the Committee, the U.S. and New York nexus of the TPC–Commodore dealings is palpable and more than sufficient for a prima facie showing of jurisdiction. It states that both TPC and Commodore were represented by New York law firms in negotiating the loans, and asserts that if this were a truly Bahamian affair, TPC would not have contracted, as part of its loan repayment, to purchase Commodore kits for sale in the U.S., nor would it have contracted to use a Commodore subsidiary to be chosen by CEL as its agent for those U.S. sales. Even if there were insufficient ties specifically to New York, the Committee maintains, an examination of all of the ties between the loan transaction and the U.S. would form a basis for asserting jurisdiction over TPC under Fed.R.Civ.P. 4(k)(2).[4]

■ It is fundamental that in determining whether we have specific, or long-arm, jurisdiction over TPC under New York law, we are concerned only with TPC's activities. *See Laufer*, 55 N.Y.2d at 312, 449 N.Y.S.2d 456, 434 N.E.2d 692 ("[A] plaintiff may not for purposes of CPLR 302 jurisdiction rely solely upon his own activity in New York"); *Sturm v. Schrank*, 43 B.R. 755, 760 (S.D.N.Y.1984) ("New York's long-arm statute is con-

cerned with the defendant's contacts with the forum state, not with plaintiff's contacts") (citing *National Iranian Oil Co. v. Commercial Union Ins. Co.*, 363 F.Supp. 129, 134 (S.D.N.Y.1973)); *Commodity Control Services Corp. v. National Maritime Surveys*, No. 83 Civ. 5781, 1984 WL 1008 (S.D.N.Y. Oct. 11, 1984) (same); *G.S.C. Associates, Inc. v. Rogers*, 430 F.Supp. 148, 151 (E.D.N.Y.1977) ("New York courts have declined personal jurisdiction where the activities within the state were those of the plaintiff rather than those of the defendant") (citing *Parke–Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 19 n. 2, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970)). Thus, we do not consider CEL or CIL's activities in this state in determining whether we have jurisdiction over TPC.

■ Under CPLR § 302(a)(1), "New York [has] personal jurisdiction over a nondomiciliary if two conditions are met: first, the nondomiciliary must 'transact business' within the state; second, the claim against the nondomiciliary must arise out of that business activity." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986) (citing *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981)); *see also Hamilton v. Garlock, Inc.*, 31 F.Supp.2d 351, 356 (S.D.N.Y.1998) (same). Whether a non-domiciliary transacts business in New York is determined by considering a number of factors, including (i) whether the defendant has an ongoing contractual relationship with a New York corporation, (ii) whether the contract was negotiated or executed in New York, (iii) whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regrading the relationship, (iv) what the choice of law clause is in

---

4. That rule states that:
 If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to

establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.
Fed.R.Civ.P. 4(k)(2).

the contract, and (v) whether the contract requires payments and notices to be sent into New York. *See Agency Rent A Car,* 98 F.3d at 29. No one of these factors is dispositive; other factors may also be considered in examining the totality of the circumstances. *Id.* The quality, rather than the quantity, of contacts with New York is the most important consideration. *See Broad Horizons, Inc. v. Central Crude Ltd.,* No. 94 Civ. 1593, 1994 WL 623075, at *2 (S.D.N.Y. Nov. 9, 1994) (citing *U.S. Theatre Corp. v. Gunwyn/Lansburgh Ltd. Partnership,* 825 F.Supp. 594, 595 (S.D.N.Y.1993)). The Committee has failed to allege any acts by TPC that, if established, would show that TPC entered New York to negotiate the loan agreements from which the alleged preferential and fraudulent conveyance action arises. In its memorandum of law, it claims that TPC, through Gould, executed certain agreements related to a subsequent loan here. However, even if TPC had executed those documents here, that alone is insufficient to establish our jurisdiction over TPC. *See Harry Winston, Inc. v. Waldfogel,* 292 F.Supp. 473, 478 (S.D.N.Y.1968) ("New York has explicitly held that the fact that the final act of execution of a mailed contract occurred in New York is in and of itself insufficient to confer jurisdiction") (citing *Standard Wine & Liquor Co. v. Bombay Spirits Co.,* 20 N.Y.2d 13, 16, 281 N.Y.S.2d 299, 228 N.E.2d 367 (1967)); *see also Agrashell, Inc. v. Bernard Sirotta Company,* 344 F.2d 583, 588 (2d Cir.1965) (suggesting it would be unconstitutional to base jurisdiction solely on the place of the last act necessary to execution of a contract).

The Committee next argues that we have specific jurisdiction over TPC pursuant to CPLR 302(a)(2) because the fundamental jurisdictional fact of this case is that TPC committed a tort by receiving a fraudulent transfer from CEL, and TPC is subject to jurisdiction in New York because of its tortious activity here. Furthermore, the Committee contends, jurisdiction over TPC is appropriate because

TPC and Gould were co-conspirators with the Commodore entities, and/or those entities acted as TPC's agent in orchestrating the transfers to TPC.

■ The CPLR provides in relevant part that "a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... commits a tortious act within the state". N.Y.C.P.L.R. § 302(a)(2). To qualify for jurisdiction under this subsection, TPC's act must have occurred while it, or its agent, was in the state. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 790 (2d Cir.1999) (citing *Feathers v. McLucas,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68, *cert. denied,* 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965)); *Bensusan Restaurant Corp. v. King,* 126 F.3d 25, 28–29 (2d Cir.1997). As we have already determined, the Committee has failed to allege any facts to show that TPC or its agent committed any acts within this state that have a nexus to the complained of transfers.

■ As to the Committee's contention that we can assert jurisdiction over TPC on a conspiracy theory, New York courts are clear that conclusory allegations of a conspiracy are insufficient to establish jurisdiction over the alleged co-conspirator. *See Bank Brussels,* 171 F.3d at 793 (citing *Lehigh Valley Indus., Inc. v. Birenbaum,* 527 F.2d 87, 93 (2d Cir.1975); *Lamarr v. Klein,* 35 A.D.2d 248, 250–51, 315 N.Y.S.2d 695 (1970), *aff'd,* 30 N.Y.2d 757, 333 N.Y.S.2d 421, 284 N.E.2d 576 (1972)). The Committee has done nothing more than make conclusory statements in its memorandum of law regarding the alleged conspiracy.

Finally, the Committee contends that we have specific jurisdiction under CPLR 302(a)(3), which provides in relevant part that:

a court may exercise personal jurisdiction over any non-domiciliary ... who in

person or through an agent ... commits a tortious act without the state causing injury to person or property within the state ... if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....

N.Y.C.P.L.R. § 302(a)(3). Without deciding where the location of the injury occurred, we have already determined that TPC does not do any business in New York. There is also no evidence that TPC has ever solicited business here or derives any revenue here, let alone substantial revenue. The Committee has also failed to adduce any facts to overcome TPC's contention that it did not expect its acts to have any consequences in this state. Thus, we find that we do not have specific jurisdiction over TPC.

### Comity and Extraterritorial Reach of Avoidance Provisions

■ TPC maintains that we should dismiss the Complaint in favor of governing Bahamian law and the pending Bahamian liquidation proceeding under principles of comity. It contends that in accordance with the holding of our court of appeals in *Maxwell Comm. Corp. v. Societe Generale (In re Maxwell Comm. Corp.)*, 93 F.3d 1036 (2d Cir.1996), we should dismiss the Complaint because Bahamian insolvency law and proceedings have long been held worthy of recognition and deference under principles of comity, and the Committee's claims, brought in the face of a concurrent and cooperating Bahamian insolvency proceeding, concern primarily Bahamian transactions between Bahamian companies which are properly to be measured and resolved under Bahamian insolvency law in the Bahamas Supreme Court. According to TPC, in addition to the fact that it is a

Bahamian corporation not qualified to do business in the U.S., CEL is also a Bahamian corporation, whose German subsidiary pledged assets and transferred inventory to TPC in connection with CEL's indebtedness to TPC, and which is not qualified to do business in the U.S., maintaining offices in Switzerland, the Philippines and Hong Kong, conducting all manufacturing overseas, and having 90% of its sales, inventory and accounts receivable abroad.

TPC also maintains that the Committee members who dealt with the Bahamian debtors recognized that they were subject to Bahamian law and thus are deemed to have accepted the possible application of Bahamian insolvency law and jurisdiction to CEL, and CEL, which filed for liquidation in the Bahamas before the Committee filed this case in the U.S., also accepted Bahamian rather than U.S. jurisdiction, when it borrowed from TPC. Finally, TPC alleges that Bahamian insolvency law differs from U.S. law since it requires a showing of actual intent to vacate a preference and limits the avoidance period to 90 days, that those differences invoke comity, and that comity requires dismissal of the Complaint for all of the same reasons stated above.

According to TPC, the U.S. does not have any interest in these foreign loan repayments to overcome the significant weight of TPC's interest in defending itself in Nassau when, as here, the dispute is between non-residents, the parties bargained for and agreed to Bahamian law and jurisdiction, and there are already insolvency proceedings pending in the Bahamas. Furthermore, it maintains, 87% of CEL's debt is owed to non-U.S. creditors, half of the Committee members are alien corporations, and we have little or no interest in litigating this case for the principal benefit of foreign creditors. TPC contends that the Bahamas has the paramount interest in regulating dealings between its corporations and, in particular, administering claims involving debtors

in liquidation by its Bahamas Supreme Court, which interest weighs heavily against the assertion of personal jurisdiction by this court even if the missing minimum contacts were present. It claims that any interest of the Committee in attempting to augment CEL's estate by invoking American rather than Bahamian avoidance rules on CEL's behalf cannot confer, or even affect, jurisdiction, and the fact that U.S. avoidance law might be more beneficial to CEL is irrelevant even to the choice of law.

The Committee maintains that TPC's comity argument ignores the fact that, unlike in *Maxwell,* the clear center of gravity of this case is here, and this forum clearly has the greatest interest in the controversy because CIL and CEL are Bahamian only in name, Commodore's world headquarters was in Pennsylvania, its Chairman Gould, president and CEO ran the company from an office in New York City, the TPC loan was negotiated and formulated in the U.S. with the participation of U.S. counsel and largely approved by Commodore's board of directors in the U.S. All of these factors, the Committee asserts, weigh heavily in favor of the conclusion that the application of U.S. bankruptcy law is appropriate and will not offend the sovereignty of the Bahamas, whose only contact with this dispute in that the parties happen to be incorporated there.

As for TPC's argument that §§ 547 and 548 have no extraterritorial application, the Committee maintains that the court's holding in *Maxwell* was confined to situations where a foreign debtor makes a transfer to a foreign transferee and the center of gravity of the transfer is overseas, which is not the case here.

■■■ Comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). In *Maxwell,* our court of appeals discussed its significance in the context of transnational bankruptcies:

> Comity is especially important in the context of the Bankruptcy Code for two reasons. First, deference to foreign insolvency proceedings will, in many cases, facilitate "equitable, orderly, and systematic" distribution of the debtor's assets. *Cunard S.S. Co. v. Salen Reefer Servs. A.B.,* 773 F.2d 452, 458 (2d Cir. 1985) ("American courts have consistently recognized the interests of foreign courts in liquidating or winding up the affairs of their own domestic business entities."); *Victrix Steamship Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d.Cir.1987) ("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings."). Second, Congress explicitly recognized the importance of the principles of international comity in transnational insolvency situations when it revised the bankruptcy laws. *See* 11 U.S.C. § 304; *see* S.Rep. No. 989, 95th Cong., 2d Sess. 35, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5821 (explaining § 304).

*Maxwell,* 93 F.3d at 1048. Bahamian insolvency law and proceedings have long been held worthy of recognition and deference by judges in this district under the principle of comity. *See In re Treco,* 229 B.R. 280 (Bankr.S.D.N.Y.), *aff'd,* 239 B.R. 36 (S.D.N.Y.1999); *Petition of Hackett,* 184 B.R. 656 (Bankr.S.D.N.Y.1995); *Matter of Culmer,* 25 B.R. 621 (Bankr.S.D.N.Y. 1982). In fact, the Protocol was devised and implemented for the purpose of coordinating the U.S. and Bahamian insolvency proceedings, which we recognized are entitled to deference in accordance with the framework established therein. It expressly contemplates that certain matters will be determined by this court, while others will be left to the Bahamian court. However, it does not specify either which

law is to be applied in determining whether pre-bankruptcy transfers can be avoided, or which court is to make that determination. We turn to *Maxwell* for guidance in making that determination.

In *Maxwell*, the debtor was a U.K. corporation headquartered in London, although approximately 80% of its assets were located in the U.S., including its subsidiaries MacMillan, Inc. and Official Airline Guide, Inc. 93 F.3d at 1040. In the fall of 1991, less than 90 days before filing for chapter 11 in the U.S. and (the following day) seeking an administration order in the High Court of Justice in London, the debtor repaid one of its English banks, Barclays Bank plc, $30 million, which amount it owed Barclays under an overdraft facility executed in the U.K., with governing law provisions providing for U.K. law. The funds to make the payment came from the proceeds of the sale of a subsidiary of MacMillan, Que Computer Books, Inc., which had originally been deposited in a Maxwell account at the New York branch of the English bank National Westminister Bank plc, and subsequently credited to the debtor's U.S. dollar account with National Westminister in London. *Id.* Repayment was effected by transferring $30 million from the debtor's dollar account in London to Barclays' New York branch, which was then credited the following day against the balance in the debtor's overdraft account at Barclays in London. The debtor also alleged that it made 11 other fund transfers to Barclays during the 90 days preceding its bankruptcy filing, but did not claim that these transfers had any connection to the U.S. *Id.* at 1040–41. The debtor had similar overdraft facilities with National Westminster, which were also negotiated in England and expressly governed by English law. A month before it sold Que, MacMillan sold another of its subsidiaries, MacMillan Directories, and at the debtor's direction, converted the proceeds to pounds sterling and transferred £ 15 million to the debtor's account at National Westminster in London in satisfaction of an overdraft balance

which existed at that time. *Id.* at 1041. It also made eight other payments to National Westminster from accounts at another London bank amounting to approximately £ 29 million shortly before it filed for bankruptcy. *Id.*

Societe Generale, a French bank headquartered in Paris with offices in London and New York, among other places, also extended credit to the debtor under an agreement negotiated and administered in England. Shortly before filing for bankruptcy, the debtor transferred approximately £ 5.75 million to Societe Generale, in satisfaction of a $10 million loan, from an account it maintained in another London bank to Societe Generale's London branch. Apparently, that payment was also funded from the proceeds of the sale of MacMillan Directories. *Id.*

Pursuant to a protocol between the U.K. administrators and the examiner appointed in the debtor's chapter 11 case, and approved by both the High Court and the Bankruptcy Court, Bankruptcy Judge Brozman recognized the English administrators as the corporate governance of the debtor in possession, and the English High Court granted the examiner leave to appear before the High Court in England. *Id.* at 1041–42.

The debtor's reorganization plan in the United States and its scheme of arrangement in England providing for a common pool from which all holders of secured and priority claims, under either United States or English law, would be paid in full and the balance distributed to claimants who could submit a claim to either the English High Court or the United States Bankruptcy Court with the same effect. *Id.* at 1042. Barclays, National Westminster and Societe General filed claims in the U.K. Neither the reorganization plan nor the protocol specified which substantive law would govern the resolution of disputed claims, nor which law would determine the ability of the debtor or the administrators to set aside pre-petition transfers. *Id.*

While the payments to Barclays might have been avoidable under § 547 of the Bankruptcy Code, the subjective intent requirement under English law would have been an almost insurmountable obstacle in any avoidance action commenced in the U.K. under English law. *Id.*

Anticipating that the debtor would commence preference litigation in the U.S. seeking to avoid the $30 million payment, Barclays obtained an ex parte order from the High Court enjoining the commencement of such an action. It later vacated that order, declining to interfere with the U.S. court's determination of the reach of U.S. avoiding powers and assuming that the bankruptcy court would dismiss any avoidance proceeding commenced by the debtor if it found that there was an insufficient connection with the U.S. *Id.* at 1043.

Freed from any injunction, the debtor commenced adversary proceedings in the Bankruptcy Court against all three banks seeking to recover the transfers and to disallow their claims under § 502(d) unless they returned the funds to the debtor with interest. All three defendants moved to dismiss under Fed.R.Civ.P. 12(b)(6), asserting, among other things, that applying § 547 to the transactions would violate the "presumption against extraterritoriality" and that dismissal was also warranted on grounds of international comity. *Id.*

The Bankruptcy Court granted the motions, finding that U.K. laws and policies were implicated to the greatest extent, that Maxwell's insolvency did not jeopardize United States interests because its holdings were sold as a going business, that most of its creditors were not United States residents, and that pursuant to

choice of law principles, the U.K. had a greater interest in applying its own laws than the United States. *Id.* (citing *In re Maxwell Communication Corp. plc,* 170 B.R. 800, 808–18 (Bankr.S.D.N.Y.1994), *aff'd,* 186 B.R. 807 (S.D.N.Y.1995), *aff'd,* 93 F.3d 1036 (2d Cir.1996)). It also found that the presumption against extraterritoriality[5] prevents the utilization of § 547 to avoid a transfer where a foreign debtor makes a preferential transfer to a foreign transferee and the center of gravity of the transfer is overseas. *Maxwell,* 170 B.R. at 814.[6] The district court affirmed on both the extraterritoriality and comity grounds, underscoring the fact that deference to the U.K. court would comport with the previous efforts by both courts to harmonize the dual proceedings. *Id.* (citing *Maxwell,* 186 B.R. 807, 813, 823 (S.D.N.Y.1995), *aff'd,* 93 F.3d 1036 (2d Cir.1996)).

The court of appeals affirmed. It noted that, in accordance with the principles set forth in the Restatement of Foreign Relations, states normally refrain from prescribing laws that govern extraterritorial activities " 'when the exercise of such jurisdiction is unreasonable' ", *id.* at 1047–48 (citing RESTATEMENT (THIRD) OF FOREIGN RELATIONS (1986) § 403(1)), and that in determining whether so legislating would be "unreasonable", all relevant factors should be evaluated, such as the link between the regulating state and the relevant activity, the connection between that state and the person responsible for the activity (or protected by the regulation), the nature of the regulated activity and its importance to the regulating state, the effect of the regulation on justified expecta-

---

**5.** The "presumption against extraterritoriality" requires a clear expression from Congress that a statute is intended to reach non-domestic conduct. *Maxwell,* 93 F.3d at 1046 (citing *Kollias v. D & G Marine Maintenance,* 29 F.3d 67, 73 (2d Cir.1994), *cert. denied,* 513 U.S. 1146, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1995)).

**6.** Judge Brozman clarified her ruling on this point as follows:

To be clear, I do not hold that no debtor may pursue a transfer overseas. What I do hold is that where a foreign debtor makes a preferential transfer to a foreign transferee and the center of gravity of that transfer is overseas, the presumption against extraterritoriality prevents utilization of section 547 to avoid the transfer.

*Id.*

tions, the significance of the regulation to the international system, the extent of other states' interests, and the likelihood of conflict with other states' regulations. *Id.* at 1048 (citing RESTATEMENT (THIRD) OF FOREIGN RELATIONS (1986) § 403(2)). The court of appeals found that it had to apply international comity principles to determine the extraterritorial reach of the Bankruptcy Code in light of the true conflict between American and British avoidance laws. According to the court, it would be impossible to distribute the debtor's assets in a manner consistent with both laws, and the "intent" requirement of English law, at least according to the parties' assumptions, would dictate a different distributional outcome than under U.S. law. *Id.* at 1049.

In determining the primacy of English law, the court found that England had a much closer connection with the disputes than the United States because the debtor and most of its creditors were British and it was a U.K. company largely controlled by British nationals and governed by a British board of directors and, thus, England had the strongest connection to the litigation. *Id.* at 1050–51. Further, the court relied upon the transfer of funds having come from an English bank account and, thus, the place of transfer was deemed to be the U.K. and not the United States. The court also looked to the loan documents and found that the borrower and the lender would have expected English law to apply. *Id.* at 1052. It placed great emphasis on the need for cooperation and harmonization, and that harmonization is in the interests of the United

States and deference should be favored. *Id.* at 1052–53.

Finally, the court of appeals found that § 502(d) did not act to disallow the banks' claims in light of its determination that under the doctrine of comity, § 547 did not apply to the pre-petition transfers at all, such that they could not in any way be included among the "transfers avoidable" listed in § 502(d), and in any case, § 502(d) did not apply to the transfers at issue for the same reasons it determined that § 547 did not. However, it rejected the district court's conclusion that § 502(d) is inapplicable merely because the banks did not file proofs of claim in the United States, since the debtor's plan and scheme required the administrators to pass along to the bankruptcy court notices of claim filed in England. *Id.* at 1054.

The court of appeals declined to decide whether "setting aside considerations of comity, the presumption against extraterritoriality would compel a conclusion that the Bankruptcy Code does not reach the pre-petition transfers at issue." *Id.* at 1055. Thus, it stated, "we express no view regarding the banks' contention that the Bankruptcy Code never applies to non-domestic conduct or conditions." *Id.*

As in *Maxwell*, we are confronted with a situation involving a protocol that was devised to harmonize concurrent insolvency proceedings in two countries, and provides that each court should apply its own law to disputes arising under its own laws, but does not specify which court is to exercise jurisdiction where particular litigation may be resolved in accordance with the law of either forum state.[7] Thus, under princi-

---

7. The Protocol provides in relevant part as follows:

> The Liquidators and the Committee recognize that the conduct of these cases involving the same debtors in two courts simultaneously intertwines the two proceedings, presenting the possibility of prejudice to the interests of the Liquidators and creditors unless the proceedings in the two courts are harmonized. Accordingly, it is the intention of the Liquidators and the Committee

> that the assets of the estate be liquidated and distributed and that the cases be administered in as economical and efficient a manner as may appear practicable under the circumstances, with once court deferring to the judgment of the other where feasible and the subject matter of a particular matter, action, proceeding, contested matter or adversary proceeding being determined in one court only, where feasible. Proceeding in accordance with the terms

ples of comity, we must determine which forum is more appropriate to resolve this dispute. Applying the factors in *Maxwell*, we conclude that the Bahamas Supreme Court is the more appropriate forum to adjudicate these claims. TPC is incorporated in the Bahamas, and there is no evidence whatsoever that it conducted any business in the U.S. or that the loans in question had any U.S. nexus. Notwithstanding the Committee's allegations that TPC systematically carried on business in this country through Mr. Gould, who is purportedly for all intents and purposes the alter ego of TPC, the Committee has adduced no evidence to establish that those allegations have any substance, despite having ample opportunity to conduct discovery for that purpose. CEL, the borrower, is also a Bahamian corporation, although it did have an office in the U.S. As discussed above, the record reflects that the loan transaction which gave rise to the repayments at issue was documented and executed in the Bahamas. The parties expressly chose Bahamian law and the Bahamian courts to resolve any disputes with respect to that loan. The funds were disbursed from the Bahamas, and the loans were secured by offshore assets. TPC made the loan to CEL, which used the funds to repay an outstanding obligation to Prudential. The payments at issue were made by CEL by transferring the proceeds of a Japanese tax refund from a Swiss bank account to TPC in the Bahamas. For the reasons stated in our discussion of jurisdiction, the fact that CIL's board of directors approved the loan, and CEL's U.S. lawyers drafted the documen-

tation in the U.S. is an insufficient connection to this forum to overcome the greater interest of the Bahamas in resolving this dispute. Similarly unavailing is the Committee's argument that the funds loaned were intended for the entire Commodore group of companies, rather than CEL alone, an allegation which in any case it has submitted no evidence to support other than CIL's consolidated financial statements, which indicate only that the obligation created by the loans was carried as an obligation of the group on a consolidated basis. In fact, the only presence that TPC manifested in New York was that Gould signed the credit agreement in connection with a subsequent loan made by TPC to CEL's German subsidiary in New York. As in *Maxwell*, we conclude that notwithstanding the fact that CEL is a debtor in the U.S., any interest that we may have in resolving this dispute is outweighed by the significant interest of the Bahamas Supreme Court. In accordance with the relevant provision of the Protocol, we defer to that court under principles of comity. In addition, we, like the courts in *Maxwell*, find that under these circumstances, §§ 547 and 548 were not intended to be deployed to avoid pre-bankruptcy transfers.

### Forum Selection Clause

■ Next, TPC argues that we should enforce the forum selection clauses in the loan documents prescribing the exclusive jurisdiction of the Bahamian courts to avoid duplicate litigation, promote efficiency and discharge the parties' expressed intent.[8] According to TPC, those forum

---

and the intent of this Protocol shall be deemed consistent with the appropriate conduct of the chapter 11 cases of CEL and CIL and the liquidation proceedings under Bahamian law.
Protocol ¶ E.

8. The loan agreements and related promissory notes all provide that Bahamian law governs any dispute between the parties and that the Bahamian courts shall have exclusive jurisdiction to resolve any such dispute. For example, the April 13, 1993 Credit Agreement

among TPC, CEL and certain CEL affiliates provides as follows:

This agreement shall be construed in accord with the law of the Bahamas, each Borrower hereby consents to the exclusive jurisdiction of the courts of the Bahamas, and consents to the validity and enforcement of any judgment hereunder or under any of the Notes or Security agreement rendered by any Court of the Bahamas.
Credit Agreement ¶ 6. .

selection clauses bind the Committee, which seeks recovery on CEL's behalf and has no greater rights than CEL would. It would be unreasonable and inefficient, TPC claims, to insist on fragmenting the judicial handling of TPC's claim against CEL and CEL's alleged claims against TPC by having TPC's claim proceed in the Bahamas Supreme Court and the Committee's avoidance challenges on CEL's behalf proceed in this court.

The Committee argues that whether or not a debtor may be permitted to escape the effect of a bargained for contractual forum selection clause in a non-core breach of contract action is irrelevant [9] since this case is a core proceeding regarding the enforcement of a statutory right to recover fraudulent transfers, and core proceedings may be heard by a bankruptcy court notwithstanding any otherwise enforceable forum selection clause in a contract. Moreover, the Committee maintains that it is not bound by the forum selection clause in the loan agreements because this is a preference action under federal bankruptcy law designed to protect the statutory rights of creditors.

■■■ As a general rule, a freely negotiated forum selection clause in an international contract unaffected by fraud, undue influence or overweening bargaining power should be given full effect, absent a "strong showing" that it should be set aside. *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 12–15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). However, a proceeding to avoid or recover assets that a debtor transfers either fraudulently or preferentially is within our core subject matter jurisdiction. *See* 28 U.S.C. § 157(b)(2)(F) and (H). A debtor-in-possession or trustee, or by implication a committee whose authority derives from them, is not bound by a forum selection clause in an agree-

ment provided the litigation at issue amounts to a core proceeding and is not inextricably intertwined with non-core matters. *See N. Parent, Inc. v. Cotter & Co. (In re N. Parent, Inc.)*, 221 B.R. 609, 620–21 (Bankr.D.Mass.1998); *accord Mercury Masonry Corp. v. Terminal Constr. Corp. (In re Mercury Masonry Corp.)*, 114 B.R. 35 (Bankr.S.D.N.Y.1990); *In Wheeling–Pittsburgh Steel Corp. v. Blue Cross Blue Shield of West Virginia, Inc. (In re Wheeling–Pittsburgh Steel Corp.)*, 108 B.R. 82 (Bankr.W.D.Pa.1989). This principle promotes strong public interest in centralization of all core matters in the bankruptcy court. *N. Parent*, 221 B.R. at 621. Thus, the Committee is not bound by the forum selection clauses in the loan agreements.

### Forum Non Conveniens

■■■ TPC also seeks dismissal on the basis of *forum non conveniens*, claiming that the Bahamas is the only convenient forum since (i) TPC and CEL are Bahamian corporations not doing business in the U.S., (ii) Bahamian law governs the underlying relationships between TPC and CEL, (iii) TPC filed its proof of claim in the Bahamas Supreme Court, which must deal with that claim, creating duplicate effort and expense with the prospect of inconsistent results if the avoidance action proceeds in this court, (iv) TPC has not submitted to the equitable jurisdiction of this court, such that any U.S. litigation would be complicated by TPC's right to a jury trial, (v) the conduct at issue here is entirely foreign, (vi) the evidence relevant to the transactions at issue is in the Bahamas, (vii) TPC has no records, employees or agents in the U.S., and (viii) CEL has control over its documents and the Com-

---

9. TPC cites to cases in which the courts enforced contractual forum selection clauses in non-core proceedings or actions initiated by debtors. *See In re Diaz Contracting, Inc.*, 817 F.2d 1047 (3d Cir.1987); *Envirolite Enters. v. Glastechnische Industrie Peter Lisec Gesells-* *chaft M.B.H.*, 53 B.R. 1007 (S.D.N.Y.1985), *aff'd*, 788 F.2d 5 (2d Cir.1986). These cases are inapposite because this proceeding is within our core jurisdiction. *See* 28 U.S.C. § 157(b)(2)(F) and (H).

mittee apparently has already deposed all U.S. witnesses.

It also claims that because both TPC and CEL have submitted to Bahamian jurisdiction, the Bahamas is an adequate forum as a matter of law, and the Bahamas Supreme Court is actually the superior forum since it is the only court that can deal efficiently and justly both with TPC's claim against CEL and any responsive avoidance claim by or on behalf of CEL. According to TPC, this forum was chosen solely by the Committee, which has no greater rights than CEL and whose choice of an American forum is not entitled to any particular deference. It maintains that U.S. litigation of CEL's avoidance claims will be cumbersome and complex since TPC is entitled to a jury trial, and in any case cannot resolve all issues involved. TPC reiterates its assertion that the local interest in resolving this dispute is minuscule for all of the reasons that we have already discussed. Private factors, TPC alleges, also favor litigating in the Bahamas, because the crux of the case, TPC and its officers and directors, and the relevant evidence are all in the Bahamas. Finally, TPC maintains that any judgment we render in this proceeding would have to be enforced in a Bahamian court since TPC has no presence in the U.S.

The Committee asserts that virtually all of the public and private factors traditionally applied in performing a forum non conveniens analysis weigh against dismissal of this proceeding. According to the Committee, (i) all of the key witnesses are present in the U.S., including Gould, who is routinely in New York, (ii) all of the important documents are in New York, Pennsylvania or foreign jurisdictions other than the Bahamas, with the possible exception of documents relating to TPC, but there is no evidence that it actually has any records in the Bahamas, (iii) the trial can be much more efficiently and inexpensively administered in New York; both parties have New York counsel and discovery and trial will be much more costly in the Bahamas given the location of the witnesses, (iv) TPC has made no showing that considerations of "court congestion" make the Bahamas a forum preferable to this court, (v) even if a judgment against TPC cannot be enforced in New York, the need for Bahamian enforcement is not that important a factor given that the ongoing Bahamian insolvency proceeding and the Protocol will ease the process, (vi) for the reasons we have discussed previously, the New York interest in these proceedings is far greater than any Bahamian interest, (vii) American law will apply, and (viii) the requirement of a jury trial is not sufficient reason to dismiss this case, and despite TPC's characterization of the case as cumbersome and complex, fraudulent conveyance law is an established part of both New York and federal case law, and there is no reason to believe that jury cannot handle the issues in this case.

The Committee further asserts that TPC's contention that if this proceeding is not dismissed, the pending Bahamian liquidation will result in duplicative and possibly inconsistent adjudications is resolved by the Protocol, which expressly recognizes that both the U.S. and the Bahamas have an interest in the bankruptcy cases, but that certain claims would more appropriately be litigated in the U.S., and accordingly provides that where feasible, issues should be litigated in one forum and the other forum should defer to whatever judgment is reached. Thus, the Committee claims, once this court determines what treatment is to be given to amounts transferred to TPC prior to the commencement of CEL's bankruptcy proceedings, the facts and issues relating to those payments need not be relitigated in the context of determining the amount of TPC's allowed claim in the Bahamian liquidation proceedings.

We have broad discretion in determining whether to dismiss an action on forum non conveniens grounds. *See Piper Aircraft v. Reyno*, 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981);

*Frink America, Inc. v. Champion Road Machinery Ltd.*, 961 F.Supp. 398, 402 (N.D.N.Y.1997). Making the determination involves a three step analysis. First, as a threshold matter, we examine the availability of an alternate forum. *Frink,* 961 F.Supp. at 402; *Nationsbank of Florida v. Banco Exterior de Espana,* 867 F.Supp. 167, 169 (S.D.N.Y.1994). Second, we consider the plaintiff's choice of forum. *Id.* Finally, we balance that choice against both "private interest factors" affecting the convenience of the litigants, and "public interest factors" affecting the convenience of the forum and the interests of justice. *Frink,* 961 F.Supp. at 402 (citing *Gulf Oil v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974 (2d Cir.1993); *Travelers Indem. Co. v. S/S Alca,* 710 F.Supp. 497, 500 (S.D.N.Y.), *aff'd without opinion,* 895 F.2d 1410 (2d Cir.1989)). Ordinarily, there is a strong presumption in favor of the plaintiff's selection of a forum, which may be overcome only when the private and public factors clearly point toward trial in the alternative forum. *Piper,* 454 U.S. at 255, 102 S.Ct. 252. This rule is based upon the logical assumption that the plaintiff's home forum is in fact the most convenient. *Id.* at 256.

■ The factors pertaining to the private interests of the litigants include: (i) the relative ease of access to sources of proof; (ii) the availability of compulsory process for attendance of unwilling witnesses; (iii) the possibility of view of premises, if view would be appropriate to the action; and (iv) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Frink,* 961 F.Supp. at 403 (citing *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839; *Borden Inc. v. Meiji Milk Products Co.,* 919 F.2d 822, 827 (2d Cir. 1990), *cert. denied,* 500 U.S. 953, 111 S.Ct. 2259, 114 L.Ed.2d 712 (1991)). There may also be questions as to the enforceability of a judgment if one is obtained. *Id.* (citing *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839).

■ The public interest factors include: (i) the administrative difficulties flowing from court congestion; (ii) the local interest in having localized controversies decided at home; (iii) the interest of having the trial in a forum that is at home with the law that must govern the action; (iv) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and (v) the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.*

■ In weighing the *Gilbert* factors, we begin with a presumption in favor of the Committee's choice of forum. *Id.* at 403 n. 4. TPC has the burden of overcoming this presumption by establishing that the *Gilbert* factors tilt strongly in favor of the alternative forum. *Id.* (citations omitted). According to the Committee, virtually all of the potential witnesses, including the CEL personnel it has already deposed, as well as representatives of CIL's outside auditors and certain of the American lawyers who represented the Commodore group and TPC in the transactions at issue, reside in the U.S. *See* Mechling Decl. ¶ 10. It also contends that documents relevant to this litigation are located in New York, Pennsylvania, and possibly, at the former locations of certain foreign CIL subsidiaries (none in the Bahamas). *Id.* TPC maintains that any documentation in its possession concerning the transactions is located in the Bahamas, and Irving Gould is a resident of that country.

Whether or not the private interest factors favor the U.S. or the Bahamas, we find that the public interest factors weigh demonstrably in favor of having any avoidance claims against TPC adjudicated by the Bahamas Supreme Court. The transactions described in the Complaint simply have no nexus with this country—so much so that we have determined that we lack personal jurisdiction over TPC. Thus, the Bahamas court clearly has a superior interest in resolving this dispute, which involves a transaction that has no connection

with the U.S. involving non-U.S. companies.

### Failure to Prosecute

TPC also argues that pursuant to Fed. R.Civ.P. 4(m),[10] 12(b)(4) and (b)(5)[11] and Fed.R.Bankr.P. 7004(a),[12] 7004(e)[13] and 7041(b),[14] we should dismiss the Complaint because the Committee did not serve TPC with the summons and Complaint until 120 days after it filed the Complaint, the summons had by that time expired and the foregoing constitutes ineffective service, insufficient process and want of prosecution. According to TPC, the Committee made no real effort to serve it within the 120 days period, even though TPC's location was well known.

The Committee argues that it can cure any defect in process caused by expiration of the summons by issuing a new summons, and in any case, the 120 period prescribed by Fed.R.Civ.P. 4(m) does not apply to service in a foreign country. It maintains that it should have the benefit of the foreign service exception because it only attempted to serve TPC in the Bahamas, whereas in all of the other decisions relied upon by TPC, service on the foreign entity was attempted in the U.S. Even if we were to conclude otherwise, the Committee argues, service of a "stale" summons is generally considered a technical and curable defect, especially where, as in this case, TPC was given more than adequate time to respond to the Complaint and was not prejudiced in any way. It also asserts that dismissal is inappropriate because there is no reason to believe that TPC cannot be served with a new summons and be brought before the jurisdiction of this court. Finally, the Committee

**10.** That rule provides as follows:

(m) Time Limit for Service. If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period. This subdivision does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1).
Fed.R.Civ.P. 4(m).

**11.** Rules 12(b)(4) and (b)(5) provide in substance that we may dismiss a complaint for insufficiency of process and insufficiency of service of process, respectively. Fed.R.Civ.P. 12(b)(4) and (b)(5).

**12.** Rule 7004(a) makes Fed.R.Civ.P. 4(a), (b), (c)(1), (d)(1), (e)–(j), (*l*) and (m) applicable herein. Fed.R.Bankr.P. 4(a).

**13.** At the time that the Committee effected service of the Complaint, Rule 7004(e) provided as follows:

If service is made pursuant to Rule 4(e)–(j) F.R.Civ.P., it shall be made by delivery of the summons and complaint within 10 days following the issuance of the summons. If service is by any authorized form of mail, the summons and complaint shall be deposited in the mail within 10 days following issuance of the summons. If a summons is not timely delivered or mailed, another summons shall be issued and served.
Fed.R.Bankr.P. 7004(e) (amended effective Dec. 1, 1999). It now provides as follows:
Service made under Rule 4(e), (g), (h)(1), (i), or (j)(2) F.R.Civ.P. shall be by delivery of the summons and complaint within 10 days after the summons is issued. If service is by any authorized form of mail, the summons and complaint shall be deposited in the mail within 10 days after the summons is issued. If a summons is not timely delivered or mailed, another summons shall be issued and served. This subdivision does not apply to service in a foreign country.
Fed.R.Bankr.P. 7004(e).

**14.** Rule 7041 makes Fed.R.Civ.P. 41 applicable herein. That rule provides as follows:

(b) Involuntary Dismissal: Effect Thereof. For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.
Fed.R.Civ.P. 41(b).

alleges, given that the statute of limitations on the claims stated in the Complaint has now expired, dismissal based upon the technicality stated in Rule 7004(e) would be manifestly inappropriate, particularly since TPC has known about this proceeding since 1997 and has participated in numerous court conferences, being heard on a number of procedural issues. Thus, the Committee contends, dismissal of the Complaint now, after the statute of limitation has run, would lead to an unjust result not required by the procedural rules.

The Committee effected service of the Complaint on TPC in the Bahamas more than 10 days after the accompanying summons was issued and more than 120 days after it filed the Complaint. However, Rule 4(m) expressly provides that the 120 day period does not apply to service in a foreign country, *see* Fed.R.Civ.P. 4(m), and all of the cases cited by TPC for the proposition that the "foreign service exception" does not apply involved service attempted on a foreign entity in the U.S. *See Montalbano v. Easco Hand Tools, Inc.*, 766 F.2d 737, 740 (2d Cir.1985); *Shaw v. Rolex Watch U.S.A., Inc.*, 745 F.Supp. 982, 987 (S.D.N.Y.1990).

However, whether or not it might be appropriate or equitable under other circumstances to find that the Committee can be deemed to have properly served TPC, it would be pointless to do so now in light of our conclusion that the Committee lacks standing to continue prosecuting this proceeding on behalf of debtors' estates, that we lack jurisdiction over TPC and that principles of comity and the doctrine of forum non conveniens warrant dismissal of the Complaint.

### Conclusion

We grant the motion.

SETTLE ORDER AND JUDGMENT.